**IN THE SUPREME COURT OF PENNSYLVANIA
EASTERN DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 717 CAP |
| | : | |
| Appellee | : | Appeal from the Order dated September |
| | : | 22, 2015 in the Court of Common Pleas, |
| | : | Dauphin County, Criminal Division, at |
| v. | : | No. CP-22-CR-0000692-2003. |
| | : | |
| | : | SUBMITTED: March 3, 2017 |
| ERNEST WHOLAVER JR., | : | |
| | : | |
| Appellant | : | |

**OPINION**

**JUSTICE BAER**                                        **DECIDED: January 11, 2018**

This is a direct appeal from an order dismissing a petition filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-9546. Appellant Ernest Wholaver, Jr. ("Appellant"), who is sentenced to death, presents the Court with a multitude of issues, none of which afford him relief.[1] We, therefore, affirm the order dismissing Appellant's petition.

### I. Factual and Procedural Backgrounds

**A. Introduction**

In July of 2002, the Commonwealth charged Appellant with several sexual offenses for alleged conduct involving his two daughters, Victoria and Elizabeth. At the

---

[1] A final order under the PCRA, in a case in which the death penalty has been imposed, is directly appealable to this Court. 42 Pa.C.S. § 9546(d).

time that the charges were filed, Elizabeth was a minor, and Victoria was the mother of a nine-month old baby named Madison. Madison's father is Francisco Ramos ("Ramos").

After the criminal charges were filed, Jean Wholaver ("Jean"), Elizabeth's mother and Appellant's wife, obtained a Protection From Abuse ("PFA") order against Appellant on Elizabeth's behalf. Among other things, the PFA order evicted Appellant from the family residence located in Middletown, Pennsylvania. As a result of this order, Appellant moved to Cambria County to live with his mother, father, and younger brother, Scott Wholaver ("Scott").

Thereafter, a preliminary hearing was held on Appellant's sexual offenses. Jean, Victoria, and Elizabeth testified against Appellant at that hearing. The charges were held for court, and trial on those charges was scheduled to commence in January of 2003.

Shortly after midnight on December 24, 2002, Appellant and Scott drove from their home in Cambria County to Jean's residence in Middletown. Scott waited in the vehicle while Appellant forcibly entered the home, where he shot and killed Jean, Victoria, and Elizabeth. Nine-month old Madison was relatively unharmed, but remained unattended until the bodies were discovered nearly 28 hours later.

Police arrested Appellant and charged him with, *inter alia*, three counts of first-degree murder. The Commonwealth subsequently issued notice that it intended to pursue the death penalty. While in prison awaiting trial, Appellant attempted to hire a man to kill Ramos (Madison's father) and frame him for the murders. The trial court consolidated the sexual offenses, murders, and the criminal solicitation related to Appellant's attempt to have Ramos killed.

The jury acquitted Appellant of the sexual offenses.  However, the jury convicted Appellant of first-degree murder as to all three victims and of the crimes of killing prosecution witnesses (Jean, Victoria, and Elizabeth, witnesses to the sexual crimes pending trial when they were killed), conspiracy, reckless endangerment, and criminal solicitation (to have Ramos killed).    The evidence presented in the guilt phase of trial was incorporated into the penalty phase.

During the penalty phase, the Commonwealth pursued four aggravating circumstances:  (1) the defendant committed a killing while in the perpetration of a felony; (2) during the commission of the offense, the defendant knowingly created a grave risk of death to another person (baby Madison) in addition to the victim of the offense; (3) the defendant has been convicted of another murder committed in any jurisdiction, either before or at the time of the offense at issue; and (4) at the time of the killing, the defendant was subject to a PFA order.[2]  42 Pa.C.S. §§ 9711(d)(6), (7), (11), and (18), respectively.  Appellant, on the other hand, sought to prove the no-significant-history-of-prior-criminal-convictions mitigating circumstance, as well as the catch-all mitigator.  42 Pa.C.S. §§ 9711(e)(1) and (8), respectively.  The jury found all of the aggravators, and at least some of the jurors accepted Appellant's mitigating circumstances.  After weighing the aggravating and mitigating circumstances, the jury returned verdicts of death as to each of the murder victims.  Appellant appealed his judgment of sentence.

## B.  Direct Appeal

This Court affirmed the judgment of sentence.  *Commonwealth v. Wholaver*, 903 A.2d 1178 (Pa. 2006).  In so doing, we concluded that the Commonwealth presented

---

[2] The aggravating circumstance regarding the defendant being subject to a PFA order pertained only to Appellant's sentence for murdering Elizabeth.

sufficient evidence to support Appellant's first-degree murder convictions and the aggravating circumstances found by the jury. *Id.* at 1182-83. Moreover, consistent with 42 Pa.C.S. § 9711(h), we determined that the sentences of death were not the product of passion, prejudice, or any other arbitrary factor. *Id.* at 1185. While Appellant raised a number of other issues, the Court found those issues were waived due to Appellant's failure to file timely a court-ordered Pa.R.A.P. 1925(b) statement. *Id.* at 1183-85.

Appellant subsequently filed a PCRA petition wherein he sought reinstatement of his right to a direct appeal due to trial counsel's failure to file timely a Pa.R.A.P. 1925(b) statement. The PCRA court granted the petition, and Appellant again appealed to this Court, raising fifteen issues, none of which warranted relief. *Commonwealth v. Wholaver*, 989 A.2d 883 (Pa. 2010). Accordingly, the Court again affirmed Appellant's judgment of sentence. Appellant petitioned the United States Supreme Court for a writ of certiorari, which was denied on October 4, 2010. *Wholaver v. Pennsylvania*, 562 U.S. 933 (2010).

## C. Current PCRA Petition

On September 2, 2011, Appellant, acting *pro se*, filed a PCRA petition. On September 8, 2011, the PCRA court issued an order dismissing the petition and granting Appellant leave to have his counsel of record file an amended PCRA petition. The order noted that courts cannot entertain *pro se* motions when a PCRA petitioner is represented by counsel. PCRA Court Order, 9/8/2011 (citing, *inter alia*, *Commonwealth v. Pursell*, 724 A.2d 293 (Pa. 1999)). Subsequently, Appellant, through counsel, filed an amended PCRA petition, which spans 247 pages and includes no fewer than 24 issues.

On April 27, 2012, Appellant filed a supplemental and amended PCRA petition. On January 8, 2013, the PCRA court issued an order and a supporting memorandum wherein the court gave notice that it intended to dismiss all but four of Appellant's issues

without holding an evidentiary hearing. *See* Pa.R.Crim.P. 909(B)(2)(a) (explaining that a judge shall issue notice to the parties of its intent to dismiss a PCRA petition if the judge is satisfied that there are no genuine issues of material fact, that the petitioner is not entitled to collateral relief, and that no legitimate purpose would be served by any further proceedings). Appellant timely filed his objections to the court's notice. On January 28, 2013, the PCRA court dismissed the claims that it identified in its notice to dismiss.[3]

An evidentiary hearing was held on September 6, 2013. The only witness to testify at that hearing was Appellant's trial counsel. Shortly thereafter, Appellant filed a motion in which he sought an opportunity to present evidence at another hearing. Following the Commonwealth's answer to this motion, the PCRA court issued an order and a supporting memorandum on March 31, 2014, providing its notice of intent to dismiss two of Appellant's four remaining claims and granting Appellant an additional hearing to address *Brady*[4] claims and related claims of ineffective assistance of counsel. As to Appellant's only other unresolved issue, which involves underlying claims of juror misconduct, the court directed the Dauphin County Court Administration to release to counsel questionnaires completed by two members of Appellant's jury. The court directed that the questionnaires be kept under protective seal.

On May 7, 2014, the PCRA court formally dismissed the two claims identified in its March 31, 2014, notice to dismiss. Appellant then asked the PCRA court to grant his request for additional discovery related to his *Brady* claims. On August 28, 2014, the

---

[3] On April 3, 2013, Appellant filed a motion in which he requested that the PCRA judge, the Honorable John F. Cherry, recuse himself from deciding the matter. The court denied the motion.

[4] *Brady v. Maryland*, 373 U.S. 83 (1963).

court granted in part and denied in part this discovery request. This order required the Commonwealth to provide to Appellant a number of documents and materials related to witnesses that the Commonwealth presented at Appellant's trial. The court denied Appellant's request for similar documents related to individuals who did not testify at trial.

On September 4th and 5th of 2014, the PCRA court held its final hearing on Appellant's PCRA petition. Over the course of those two days, in connection with his substantive *Brady* claims, Appellant presented the testimony of Robert Marley, Steven Stephens, Wilson Talavera, and James Meddings, all of whom spent time in prison with Appellant after his arrest and were Commonwealth witnesses at Appellant's trial. Appellant also presented testimony from two members of his jury and from Ronald Diller ("Agent Diller"), who, as a narcotics agent for the Pennsylvania Attorney General, had utilized Robert Marley as a confidential informant. The Commonwealth presented testimony from only one witness, Francis Chardo, Esquire ("Attorney Chardo"). Attorney Chardo is the Assistant District Attorney of Dauphin County who prosecuted Appellant.

On January 6, 2015, Appellant filed a motion for discovery, which the court denied. Appellant subsequently filed a motion for leave to amend his PCRA petition to conform to the evidence presented at the evidentiary hearings. The court granted this motion, noting that the facts and allegations as set forth in the motion were incorporated into Appellant's previously filed PCRA petition and supplements thereto. On September 22, 2015, the PCRA court issued an order and a supporting memorandum denying Appellant's remaining claims and dismissing the PCRA petition.[5]

---

[5] The PCRA court mistakenly informed Appellant that he had 30 days to appeal the order to the Superior Court, rather than to this Court. Appellant filed a motion to modify the order to reflect that an appeal from the order should be pursued in this Court. The (continued…)

## II. General Principles of Law

In order to be eligible for PCRA relief, a petitioner must prove by a preponderance of the evidence that his conviction or sentence resulted from one or more of the enumerated circumstances found at 42 Pa.C.S. § 9543(a)(2) (delineating the eligibility requirements of the PCRA). A petitioner also must demonstrate that the issues raised in his PCRA petition have not been previously litigated or waived. *Id.* at § 9543(a)(3). An issue has been previously litigated if "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue." *Id.* at § 9544(a)(2). For purposes of the PCRA, a claim is waived "if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state postconviction proceeding." *Id.* at § 9544(b).

Appellant raises multiple issues for review, many of which allege the ineffective assistance of counsel. It is well-settled that counsel is presumed to have been effective and that the petitioner bears the burden of proving counsel's alleged ineffectiveness. *Commonwealth v. Cooper*, 941 A.2d 655, 664 (Pa. 2007). To overcome this presumption, a petitioner must establish that: (1) the underlying substantive claim has arguable merit; (2) counsel did not have a reasonable basis for his or her act or omission; and (3) the petitioner suffered prejudice as a result of counsel's deficient performance, "that is, a reasonable probability that but for counsel's act or omission, the outcome of the proceeding would have been different." *Id.* A PCRA petitioner must address each of these prongs on appeal. *See Commonwealth v. Natividad*, 938 A.2d 310, 322 (Pa. 2007) (explaining that "appellants continue to bear the burden of pleading

_____

(…continued)
court never ruled on the motion; however, Appellant properly and timely filed a notice of appeal which reflected that he would be appealing the matter to this Court.

and proving each of the *Pierce* elements on appeal to this Court"). A petitioner's failure to satisfy any prong of this test is fatal to the claim. *Cooper*, 941 A.2d at 664.

Generally speaking, when this Court reviews an order dismissing or denying a PCRA petition, its standard of review is whether the findings of the PCRA court are supported by the record and are free from legal error. *Commonwealth v. Ligons*, 971 A.2d 1125, 1136-37 (Pa. 2009). "The PCRA court's credibility determinations, when supported by the record, are binding on this Court[.]" *Commonwealth v. Mason*, 130 A.3d 601, 617 (Pa. 2015) (quoting *Commonwealth v. Roney*, 79 A.3d 595, 603 (Pa. 2013)). Appellant has the burden to persuade this Court that the PCRA court erred and that such error requires relief. *See Commonwealth v. Brown*, 48 A.3d 1275, 1277 (Pa. Super. 2012) ("It is an appellant's burden to persuade [an appellate court] that the PCRA court erred and that relief is due."); *see also Commonwealth v. Bracey*, 795 A.2d 935, 940 n.4 (Pa. 2001) (stating that the appellant failed to meet his burden of establishing that he is entitled to relief). Lastly, it is well settled that this Court may affirm a valid judgment or order for any reason appearing as of record. *Commonwealth v. Flanagan*, 854 A.2d 489, 503 (Pa. 2004).

## III. Discussion

### A. Introduction

Appellant's brief to this Court presents issues and arguments in a manner that hampers our review. For example, Appellant enumerates sixteen issues for this Court's consideration, which he presents in a seemingly haphazard order. Some of his issues combine several distinct claims that must be examined individually, while many other issues contain multiple sub-issues. In addition, the documents which contain Appellant's myriad PCRA claims span nearly 300 pages collectively. Yet, in presenting his multitude of issues and sub-issues on appeal, Appellant's brief fails to indicate

where he raised and preserved these issues in the PCRA court, in violation of Pa.R.A.P. 2117(c) and 2119(e). To avoid further complications, we set forth his issues *verbatim* and address them in the order in which he presents them in his appellate brief.

**B. Issues**

**Issue I:** "Did the PCRA court err in denying Appellant a full, fair, and reliable PCRA review?" Appellant's Brief at 5.

Appellant contends that the PCRA court denied him a full and fair review of his claims by: (1) denying several of his discovery requests, Appellant's Brief at 16-17; (2) dismissing 21 of his PCRA claims without holding an evidentiary hearing, *id.* at 18; (3) impermissibly prejudging claims upon which the court granted an evidentiary hearing, *id.* at 18-19; and (4) improperly limiting the presentation of evidence at the evidentiary hearings, *id.* at 19-20. While Appellant asserts that the PCRA court erred in this regard, as the Commonwealth points out, he fails to present developed arguments in support of these assertions.[6]

For instance, regarding the 21 claims that the PCRA court denied without holding an evidentiary hearing, Appellant states, "Because each of these claims was meritorious and involved genuine issues of material fact - as the respective discussions in this Brief and the supporting evidence demonstrate - the PCRA court erred in dismissing them without a hearing."[7] Appellant's Brief at 18. In support of this statement, Appellant

---

[6] Commonwealth's Brief at 20-25.

[7] Here and throughout this issue, Appellant seems to attempt to support his claims by incorporating by reference arguments that he has made elsewhere. *See*, *e.g.*, Appellant's Brief at 17-18 ("As argued in the respective motions Appellant filed, his pleadings and the testimony at the evidentiary hearing established good cause to obtain the requested discovery."). This Court has "held that such 'incorporation by reference' is an unacceptable manner of appellate advocacy for the proper presentation of a claim for relief[.]" *Commonwealth v. Briggs*, 12 A.3d 291, 342 (Pa. 2011).

merely cites *Commonwealth v. D'Amato*, 856 A.2d 806, 820 (Pa. 2004), and Pa.R.Crim.P. 909(B)(2), both of which simply explain the procedure for dismissing a PCRA claim when a court is satisfied that the claim does not warrant an evidentiary hearing. Appellant makes no effort to demonstrate how the PCRA court erred in this regard or with respect to any of the other claims that he raises under this issue. Consequently, this issue warrants no relief. *See Commonwealth v. Williams*, 732 A.2d 1167, 1175 (Pa. 1999) (recognizing "the unavailability of relief based upon undeveloped claims for which insufficient arguments are presented on appeal").

**Issue II:** "Did the PCRA court err in denying Appellant's claim that the lower court violated his constitutional rights by denying him the expert assistance necessary for an adequate defense, and prior counsel were ineffective for failing to fully litigate this issue?" Appellant's Brief at 5.

Prior to his trial, Appellant was granted *in forma pauperis* status. Soon thereafter, he petitioned the president judge of Dauphin County for the appointment and payment of experts in ballistics, pathology, psychiatry, and serology. He also sought funds for a specific private investigator. The president judge appointed pathology and ballistics experts but did not fund those experts in the amounts Appellant wanted. Instead of the requested psychiatrist, the president judge appointed a psychologist, Lawrence McCloskey, Ph.D., and funded him in a lesser amount than Appellant asked. In addition, the president judge appointed a different private investigator than Appellant requested and again provided less funding than Appellant wanted.

Appellant subsequently filed a petition renewing several of his requests for experts and funding, and contending, *inter alia*, that the limitations that the court imposed upon him were unreasonable and unconstitutional. Renewed Petition for Expert Witness Expenses, 5/14/2004, at ¶12. Trial counsel submitted a 57-page brief in

support of this petition and later filed addenda and several supplemental motions in which he continued his pursuit of obtaining the services of experts. Trial counsel's efforts were largely unsuccessful.

Appellant reiterated these claims in his direct appeal *nunc pro tunc*, contending that "the president judge denied him the tools for an adequate defense by limiting the funds given to him to retain qualified, independent experts[.]" *Wholaver*, 989 A.2d at 893. He argued that "the court's actions violated his rights to due process, to present a defense, to have competent counsel, and to confront his accusers, necessitating a new trial." *Id.* at 894. In support of his arguments, Appellant relied, in part, upon the United States Supreme Court's decision in *Ake v. Oklahoma*, 470 U.S. 68 (1985).[8] This Court rejected Appellant's various arguments and determined that the trial court did not abuse its discretion with regard to the appointment of experts and funding that the court provided to Appellant. *Wholaver*, 989 A.2d at 894-96.

In his PCRA petition, Appellant again claimed that the president judge erred in the manner in which he disposed of his requests for expert services and funding. PCRA Petition, 1/12/2012, at 26-54. In so doing, Appellant detailed trial counsel's extensive efforts in advocating for the appointment and funding of experts - efforts which exceed

---

[8] In *Ake*, the Supreme Court held that

> when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense. This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own.

*Ake*, 470 U.S. at 83.

those described above.  *Id.* at 26-34.  Appellant contended that the trial court's rulings violated his constitutional rights, "including his rights to expert assistance, to competent counsel, to due process, to present a defense, to confront witnesses, to rebut the Commonwealth's case, and to a fair trial."  *Id.* at 34.

Appellant nonetheless argued that trial counsel rendered ineffective assistance because, according to Appellant, he objected to the trial court's rulings only on the basis of *Ake*.  *Id.* at 54.  Appellant asserted that, had trial counsel raised the constitutional violations that Appellant outlined in his PCRA petition, "there is a reasonable likelihood of a different result."  *Id.* at 54-55.  In addition, Appellant contended that appellate counsel rendered ineffective assistance "by failing to raise or adequately litigate these issues."  *Id.* at 55.

The PCRA court denied these claims without holding an evidentiary hearing, concluding that the only aspect of Appellant's claims that was not previously litigated and is cognizable under the PCRA is Appellant's argument that appellate counsel rendered ineffective assistance by solely pursuing a claim that the trial court's decisions violated *Ake*.  PCRA Court Memorandum, 1/8/2013, at 15-16.  In this regard, the court essentially determined that Appellant failed to state with sufficient specificity what other arguments he believed appellate counsel should have presented on direct appeal.  *Id.* at 16.

In his brief to this Court, Appellant once again reiterates his long-standing claim that the president judge's decisions regarding his requests for experts and funding unconstitutionally curtailed his ability to investigate and present his defense.  Appellant's Brief at 20-26.  He then recounts his claims of ineffective assistance of trial and appellate counsel.  *Id.* at 27-28.

As to any error committed by the PCRA court, Appellant initially maintains that his claim of trial counsel ineffectiveness was not previously litigated. *Id.* at 28. He also takes the position that, in concluding that appellate counsel properly raised his current claim on direct appeal, the PCRA court "ignored that there were numerous aspects to the claim that competent counsel would have included in appellate briefing." *Id.* at 28-29. The Commonwealth disagrees with Appellant's position, arguing, *inter alia*, that both trial and appellate counsel provided competent stewardship in presenting this issue on direct appeal. Commonwealth's Brief at 29-30.

Initially, we agree with Appellant that, while he previously litigated the underlying issue regarding the trial court's rulings, he did not previously litigate his wholly distinct legal claim of ineffective assistance of counsel. *See Commonwealth v. Cox*, 983 A.2d 666, 699 (Pa. 2009) (explaining that, in *Commonwealth v. Collins*, 888 A.2d 564 (Pa. 2005), "this Court held that a Sixth Amendment claim alleging ineffective assistance of counsel raises an issue cognizable under the PCRA even if the claim underlying the ineffectiveness claim had been previously litigated"). We nonetheless conclude that this oversight by the PCRA court does not entitle Appellant to relief. *See Commonwealth v. Tedford*, 960 A.2d 1, 14 (Pa. 2008) (stating that, when a PCRA court improperly disposes of claims of ineffective assistance of counsel as previously litigated where only the underlying substantive issue was previously litigated, a remand to that court for further analysis under *Collins* is unnecessary "when the claims are obviously deficient for other reasons").

Appellant's assertion that trial and appellate counsel challenged the pertinent trial court rulings simply by relying on *Ake* is inaccurate. Indeed, a review of the record reveals that counsel maintained that the trial court's rulings violated a number of Appellant's constitutional rights, including the rights he has cited in his attack on

counsel's stewardship. *See*, *e.g.*, Renewed Petition for Expert Witness Expenses, 5/14/2004, at ¶12 (asserting that the court's rulings deprived Appellant of his rights to mount a constitutionally adequate defense, to confront his accusers, and to challenge the Commonwealth's evidence); Appellant's Direct Appeal *Nunc Pro Tunc* Brief at 25 ("The court's actions violated Appellant's state-protected rights to due process, to present a defense, to competent counsel and to confront one's accuser."); *see also Wholaver*, 989 A.2d at 894 (explaining that Appellant argued that the trial court's "actions violated his rights to due process, to present a defense, to have competent counsel, and to confront his accusers, necessitating a new trial"). Because the premise underlying Appellant's claims is belied by the record, this issue warrants no relief.

**Issue III:** "Did the PCRA court err in denying Appellant's claim that trial counsel was ineffective for failing to challenge the admissibility and weight of the Commonwealth's forensic document examiner's conclusions and for failing to present an independent expert?" Appellant's Brief at 5.

At trial, the Commonwealth presented the testimony of James Meddings, who testified that, while he was imprisoned with Appellant in Dauphin County on federal charges, Appellant informed him of his desire to hire someone to kill Ramos. Trial Transcript at 663.[9] According to Meddings, Appellant wanted the hitman to leave a note at the scene stating that Ramos had killed Appellant's family and then committed suicide. *Id.* Meddings further testified that, armed with this information, he agreed to cooperate with the investigation into the murders of Appellant's family. *Id.* at 666. In

---

[9] Appellant's trial took place from August 23, 2004, to August 31, 2004. The notes of testimony from all days of trial are numbered consecutively. Thus, when we cite to those notes, we simply will refer to them as the "Trial Transcript."

short, with Meddings' help, Appellant communicated *via* letter, to a putative would-be hitman, his desire to have Ramos killed.

Unbeknownst to Appellant, the recipient of the letter actually was Drug Enforcement Administration Agent Jack Luikart ("Agent Luikart"), who also testified about this arrangement at Appellant's trial. *Id.* at 708-18. The Commonwealth subsequently offered the testimony of Kersten Jackson, an expert in forensic document and handwriting identification. Jackson testified that she compared the handwriting in the letter received by Agent Luikart to a known writing of Appellant and concluded, to a reasonable degree of scientific certainty, that Appellant was the author of the letter. *Id.* at 727.

In his PCRA petition, Appellant first claimed that trial counsel was ineffective for failing to request a *Frye*[10] hearing to test the admissibility of Jackson's testimony because, in Appellant's view, "the methodology underlying the field of handwriting analysis has not been proven to be reliable or capable of producing valid results that are generally accepted in the scientific community." PCRA Petition, 1/12/2012, at 94. Appellant also maintained that counsel rendered ineffective assistance by failing to obtain an expert to help prepare him to cross-examine Jackson and to testify regarding the unreliability of handwriting analysis.[11] *Id.* at 97-101 and 232-34.

The PCRA court rejected these claims without holding an evidentiary hearing. Concerning Appellant's *Frye* claim, the court correctly noted that, under *Frye*, "novel scientific evidence is admissible if the methodology that underlies the evidence has general acceptance in the relevant scientific community." *Grady v. Frito-Lay, Inc.*, 839

---

[10] *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

[11] In support of these claims, Appellant submitted the report of Mark Denbeaux, a purported expert on the limitations of forensic evidence.

A.2d 1038, 1043-44 (Pa. 2003); PCRA Court Memorandum, 1/8/2013, at 21. The court concluded that this claim lacks arguable merit because handwriting comparison does not constitute novel scientific evidence. In support of this conclusion, the court highlighted that the Pennsylvania Rules of Evidence expressly allow for expert and lay testimony in this area. 42 Pa.C.S. § 6111(a) and (b).[12]

As to Appellant's claim that trial counsel was ineffective for failing to obtain an expert, the PCRA court first summarized Jackson's credentials. PCRA Court Memorandum, 1/8/2013, at 22. The court then questioned how trial counsel could have effectively cross-examined Jackson, as Appellant failed to put forth any evidence suggesting that she was not a qualified expert in handwriting comparison. *Id.* at 22-23. Moreover, the court, in effect, concluded that Appellant was not prejudiced by any

---

[12] Section 6111 states, in relevant part, as follows:

> **(a) Opinion evidence as to handwriting.--**Where there is a question as to any writing, the opinions of the following persons shall be deemed to be relevant:
>
> > (1) The opinion of any person acquainted with the handwriting of the supposed writer.
> >
> > (2) The opinion of those who have had special experience with, or who have pursued special studies relating to, documents, handwriting, and alterations thereof, who are called experts in this section.
>
> **(b) Comparison of handwriting.--**It shall be competent for experts in giving their testimony, under the provisions of this section, to make comparison of documents and comparison of disputed handwriting with any documents or writing admitted to be genuine, or proven to the satisfaction of the judge to be genuine, and the evidence of such experts respecting the same shall be submitted to the jury as evidence of the genuineness or otherwise of the writing in dispute.

42 Pa.C.S. § 6111.

alleged failure by counsel to obtain an expert to rebut Jackson's testimony, as the evidence of his guilt was overwhelming. *Id.* at 23.

In his brief to this Court, Appellant renews his claims of ineffective assistance of counsel. Appellant's Brief at 29-36. In terms of the PCRA court's analysis, Appellant offers a brief argument that the court erred by rejecting his claims. *Id.* at 36. Concerning the court's application of the rule of evidence found at 42 Pa.C.S. § 6111, Appellant simply comments, "Regardless of Jackson's years of training and experience, the discipline in which she was trained and in which she practices lacks the hallmarks of scientific reliability." *Id.* Appellant then asserts that the PCRA court did not address his claim that "trial counsel should have challenged the weight of Jackson's testimony once she was permitted to offer her conclusions to the jury." *Id.* For its part, the Commonwealth counters with a cursory argument, noting, *inter alia*, that a *Frye* hearing was unnecessary given that the admissibility of expert testimony regarding handwriting analysis is specifically provided for in Section 6111. Commonwealth's Brief at 31-32.

Turning now to our disposition of these claims, we observe that, at Appellant's trial, there was a question regarding who authored the letter received by Agent Luikart. In such circumstances, Subsection 6111(a)(2) deems relevant the opinions of experts, like Jackson. 42 Pa.C.S. § 6111(a)(2). Moreover, Subsection 6111(b) expressly regards as competent Jackson's method of determining that Appellant authored the letter, *i.e.*, the comparison of disputed handwriting to known examples of the handwriting to be scrutinized for its authorship. *Id.* at § 6111(b). In the face of this rule, we can discern no error in the PCRA court's conclusion that there is no merit to Appellant's claim that trial counsel should have requested a *Frye* hearing to examine the admissibility of Jackson's testimony.

Moreover, Appellant has failed to establish that he was prejudiced by counsel's decision not to obtain an expert to aid in diminishing the weight of Jackson's testimony. At best, such an expert may have lessened the impact of Jackson's scientific conclusion that Appellant wrote the letter received by Agent Luikart. However, in light of the testimony of Meddings and Agent Luikart regarding Appellant's scheme to have Ramos killed, Appellant has failed to meet the third prong of the ineffective-assistance-of-counsel standard that, but for counsel's failure to hire an expert to refute the reliability of handwriting analysis, a reasonable probability exists that the outcome of Appellant's trial would have been different. For these reasons, we conclude that the PCRA court did not err by rejecting these claims.

**Issue IV:** "Did the PCRA court err in denying Appellant's claim that he was convicted and sentenced to death on the basis of inaccurate and unreliable forensic testimony, and that trial counsel was ineffective for failing to adequately investigate, develop, and present expert forensic testimony and evidence?" Appellant's Brief at 5.

During the course of Appellant's trial, Wayne Ross, M.D., testified for the Commonwealth. Trial Transcript at 86-122. Dr. Ross is the forensic pathologist who performed autopsies on Jean, Victoria, and Elizabeth. Dr. Ross testified to a number of topics, including the victims' time of death and risks to which nine-month old Madison was potentially exposed during the hours that she was unattended after the murders. *Id.* at 98-101. Under direct examination, the doctor opined that the victims died between 4:00 a.m. and 4:30 a.m. on December 24, 2002. *Id.* at 98-99. As to the dangers to Madison, Dr. Ross testified, *inter alia*, that: Madison did not receive her medication for an ear infection, which left untreated could spread to the brain and cause meningitis and death; and Madison could have been injured or killed by falling down steps or eating shampoo or the like. *Id.* at 100.

Relevant to Dr. Ross' testimony, Appellant presented two distinct issues in his PCRA petition. Appellant first contended that Dr. Ross' testimony was unreliable and, thus, that presentation and consideration of this evidence violated his right to due process.[13] Specifically, regarding Dr. Ross' time-of-death testimony, Appellant asserted that "it was improper as a matter of forensic pathology to render an opinion to such a narrow window of time - here, only 30 minutes." PCRA Petition, 1/12/2012, at 224. Appellant further highlighted that, during his testimony, Dr. Ross confirmed that the coroner's report indicated that all three bodies were in full rigor mortis at the time they were discovered. Appellant, however, maintained that the coroner's report makes no mention of post-mortem changes to the victims, thereby calling into question Dr. Ross' time-of-death testimony. *Id.* at 225.

Discussing the same issue, Appellant also posited that Dr. Ross' testimony about risks to Madison was unreliable. Appellant stated that there was no evidence of record demonstrating that Madison could crawl; yet, according to Appellant, much of Dr. Ross' testimony was contingent on Madison being able to traverse some distance. Additionally, Appellant took the position that Dr. Ross' testimony that an ear infection can result in death was pure speculation. *Id.* Under a separate and distinct issue, Appellant claimed that trial counsel was ineffective for failing to obtain an expert to challenge Dr. Ross' testimony. *Id.* at 226-32.

The PCRA court dismissed the due process claim without holding an evidentiary hearing. The court found that the claim was not cognizable under the PCRA, essentially because, on direct appeal, this Court held that the evidence admitted of record was sufficient to support Appellant's convictions and the aggravating circumstances found by

---

[13] In support of this claim, Appellant submitted the reports of Jonathan Arden, M.D., and Richard Callery, M.D.

the jury. PCRA Court Memorandum, 1/8/2013, at 54. The court, however, determined that a hearing was necessary to dispose of Appellant's separate claim of ineffective assistance of counsel. *Id.* at 55. That hearing occurred on September 6, 2013, and trial counsel was the only witness to testify. The PCRA court ultimately dismissed the claim, reasoning that counsel thoroughly and effectively cross-examined Dr. Ross, thus negating any need to rebut his testimony with expert testimony. PCRA Court Memorandum, 3/31/2014, at 12-14.

In his brief to this Court, Appellant seems to have combined into one issue his due process and ineffective-assistance-of-counsel claims. Appellant's Brief at 36-42. He offers a misguided argument that the PCRA court erred by rejecting his claims. *Id.* at 42. Appellant initially notes that the PCRA court found his due process claim to have been previously litigated. However, Appellant next incorrectly asserts that the PCRA court dismissed his ineffective assistance of counsel claim on the basis that that the claim was cumulative of other issues that Appellant presented in his PCRA petition. *Id.* (citing to the PCRA court's January 8, 2013, memorandum). In his only assertion of PCRA court error, Appellant contends that his "claim of ineffective assistance is neither waived nor previously litigated" and that, therefore, this Court should grant relief.[14] *Id.*

Contrary to Appellant's summary, the PCRA court did not dismiss his ineffective-assistance-of-counsel claim regarding Dr. Ross' testimony in its January 8th memorandum. Instead, in that memorandum, the court granted Appellant an evidentiary hearing on the issue.[15] PCRA Court Memorandum, 1/8/2013, at 55.

---

[14] In response to Appellant, the Commonwealth offers an argument that effectively mirrors the reasoning employed by the PCRA court in rejecting Appellant's claims. Commonwealth's Brief at 32-33.

[15] In its January 8th memorandum, the PCRA court did comment that Appellant's ineffective-assistance-of-counsel claim appeared to be an attempt to "demonstrate a cumulative effect in creating prejudice against [Appellant] during the guilt phase at trial." (continued…)

Moreover, the PCRA court did not find that Appellant waived or previously litigated this claim of ineffective assistance of counsel. Rather, as detailed above, the PCRA court found that Appellant previously litigated his distinct due process claim regarding Dr. Ross' testimony. *Id.* at 54.

As to Appellant's claim that counsel rendered ineffective assistance, the court ultimately found the claim meritless in its March 31, 2014, memorandum, opining that trial counsel effectively cross-examined Dr. Ross and, thus, negated any need to rebut his testimony with expert testimony. PCRA Court Memorandum, 3/31/2014, at 12-14. Because Appellant does not assign any error to the manner in which the PCRA court actually disposed of his claims, he has failed to meet his burden of proving that the PCRA court erred. *See Brown*, *supra* ("It is an appellant's burden to persuade [an appellate court] that the PCRA court erred and that relief is due."); *see also Com. ex rel. Robinson by Robinson v. Robinson*, 478 A.2d 800, 804 (Pa. 1984) (explaining that "the burden is on the appellant, and not the appellate court, to demonstrate that the trial court's decree is, under the evidence, manifestly erroneous or based on an error of law"). Accordingly, this issue warrants no relief.

> **Issue V:** "Did the PCRA court err in denying Appellant's claim that the trial court's refusal to suppress statements elicited outside the presence of counsel violated his constitutional rights, and trial counsel was ineffective for failing to properly litigate the issue?" Appellant's Brief at 5.

---

(…continued)
PCRA Court Memorandum, 1/8/2013, at 55. The court further commented that this Court has held that "no number of failed claims may collectively attain merit if they could not do so individually." *Id.* (quoting *Commonwealth v. Ly*, 980 A.2d 61, 97 (Pa. 2009)). Yet, the court clearly granted Appellant an evidentiary hearing on the issue. *Id.* ("However, the Commonwealth has conceded to hold a hearing on this issue and we therefore withhold disposition of this issue until a hearing is held.").

Prior to his trial, Appellant filed a motion to suppress statements that he made to James Meddings while they were both in prison. Appellant characterized Meddings as an inmate acting as a state agent and claimed that his constitutional rights were violated when he spoke with Meddings because, prior to their conversations, Appellant was not given notice or the opportunity to invoke his rights to counsel and to remain silent. The trial court denied the suppression motion, and in his direct appeal *nunc pro tunc*, Appellant challenged the trial court's ruling.

This Court determined that Appellant's claim failed, holding that it was permissible for Meddings to question Appellant about soliciting Ramos' murder, as Appellant's right to counsel had not yet attached with respect to that specific charge. *Wholaver*, 989 A.2d at 896-97. We further held that the trial court properly determined that Meddings was not a Commonwealth agent when he spoke to Appellant. *Id.* at 897 (quoting Trial Court Opinion, 4/21/2004, at 12).

In his PCRA petition, Appellant reiterated his claim that his right to counsel was violated when he spoke to Meddings in prison because: (1) his right to counsel had attached when he made statements to Meddings (PCRA Petition, 1/12/2012, at 57-61); (2) Meddings was acting as a government agent when he spoke with Appellant (*id.* at 61-62); and (3) Meddings deliberately elicited incriminating information from Appellant (*id.* at 62-64). For these reasons, Appellant claimed that the trial court erred by denying his motion to suppress. *Id.* at 64. In connection to this assertion of trial court error, Appellant presented fairly generic claims of ineffective assistance of trial and appellate counsel. *Id.* at 65-68.

Appellant further developed his claim of ineffective assistance of trial counsel in his supplemental and amended PCRA petition by highlighting that, at the suppression hearing, Meddings testified that he began cooperating with law enforcement on March

27, 2003. Supplemental and Amended PCRA Petition, 4/27/2012, at 9. Appellant contended that motions Meddings filed in his federal criminal case proved this testimony to be false, as the motions allegedly establish that Meddings had been cooperating with local and federal authorities since his arraignment in federal court, which occurred on December 30, 2002.[16] *Id.* Appellant further stated that several witnesses were available at the time of the suppression hearing to testify that Meddings, in fact, was a government agent when he spoke with Appellant in prison.[17] *See id.* at 10 (stating that witnesses "indicate that [M]eddings was a government agent"). In addition, Appellant contended that, in March of 2012, Meddings admitted to his investigator that he had obtained information from Appellant at the direction of the Commonwealth. *Id.* at 11-12.

Appellant claimed in his amended and supplemental PCRA petition that the Commonwealth violated *Brady* by failing to disclose the full extent of Meddings' cooperation with law enforcement and by failing to correct Meddings' allegedly false testimony. *Id.* at 12-15. He further claimed that trial counsel was ineffective for failing to review the filings in Meddings' federal case and for failing to interview the aforementioned inmates who were incarcerated with Appellant and Meddings. *Id.* at 15-16. Appellant suggested that, had counsel taken these steps, Meddings' testimony

---

[16] Appellant mistakenly states in his PCRA petition that Meddings was arraigned in December of 2003. Supplemental and Amended PCRA Petition, 4/27/2012, at 9.

[17] In support of this statement, Appellant offered declarations from Andre West and John Tharrett, both of whom spent time in prison with Appellant and Meddings. Contrary to Appellant's assertions, however, West and Tharrett did not state in their declarations that Meddings was a government agent. Instead, West essentially explained that Meddings successfully manipulated Appellant to acquire a reduced sentence. Appendix to PCRA Petition, 1/12/2012, Tab 17, at ¶6. Tharrett merely declared that Meddings kept tabs on Appellant, pried him for information, and got upset if other inmates spoke to Appellant. *Id.*, Tab 25, at ¶4.

would have been excluded, which in turn would have created a reasonable likelihood that the jury would have returned a different verdict. *Id.* at 16.

The PCRA court denied these claims without holding an evidentiary hearing. The court concluded that the underlying suppression claim had been previously litigated on direct appeal, thus rendering his claims of trial court error and trial counsel ineffectiveness not cognizable under the PCRA. PCRA Court Memorandum, 1/8/2013, at 16. The court also determined that appellate counsel did not render ineffective assistance.[18] *Id.* at 17.

In his brief to this Court, Appellant reasserts the claims that he made in the PCRA court, save for his claim that appellate counsel rendered ineffective assistance. Appellant's Brief at 43-52. Relevant to trial counsel, Appellant contends that counsel was ineffective for improperly litigating his motion to suppress statements Appellant made to Meddings by failing to review Meddings' publicly available federal court filings and by failing to contact inmates who observed Meddings' coercive behavior toward Appellant in prison.[19] Appellant's Brief at 49. In terms of any error committed by the

---

[18] The PCRA court did not address Appellant's *Brady* claim. Although Appellant renews his *Brady* claim in his brief to this Court (Appellant's Brief at 51-52), he assigns no error to the PCRA court with respect to this claim (Appellant's Brief at 52-53).

[19] Appellant also maintains that trial counsel inappropriately limited "his admissibility challenge to statements relating to the murder solicitation, as opposed to challenging all of the many incriminating statements made by Appellant to Meddings." Appellant's Brief at 49. In violation of Pa.R.A.P. 2119(c), Appellant fails to provide a citation to the record as to where counsel allegedly limited his suppression request to statements Appellant made to Meddings concerning only the solicitation of Ramos' murder. Moreover, a review of Appellant's brief in support of his motion to suppress reveals that counsel sought an order suppressing all of the statements Appellant made to all of the inmates purportedly acting as government agents, including Meddings. *See* Defendant's Brief with Respect to Pre-Trial Motions, 1/23/2004, at 12 ("Accordingly, all statements made to Commonwealth actors or government actors by Ernest Wholaver after December 20, 2002 should be suppressed.").

PCRA court, Appellant simply asserts that this Court should grant relief because his claim of ineffective assistance of trial counsel had not been previously litigated and was ripe for review in the PCRA proceedings.[20]  *Id.*at 52-53 (citing to *Commonwealth v. Grant*, 813 A.2d 726, 738 (Pa. 2002)).

Initially, we agree with Appellant that, while he previously litigated the underlying suppression issue, he did not previously litigate his wholly distinct legal claim of ineffective assistance of counsel.  *See Cox*, *supra*.  We, however, disagree with his bald assertion that this oversight by the PCRA court entitles him to relief.  *See Tedford*, *supra*.

As noted above, Appellant now believes that trial counsel should have interviewed jailhouse witnesses West and Tharett and, apparently, that counsel should have called them to testify at his suppression hearing.  Yet, their declarations reveal that they would not have testified that Meddings was a government agent.  Rather, their testimony would have suggested that Meddings manipulated Appellant to get information to help Meddings' cause.  *See*, *supra*, at 23 n.17.  Such testimony adds little to Meddings' suppression testimony, where he described the manner in which he worked with the Commonwealth concerning Appellant's case.  N.T., 12/2/2003, at 38-51.

Moreover, at best, had trial counsel discovered the motions that Meddings filed in federal court (which suggest that Meddings began cooperating with the Commonwealth after his arraignment on December 30, 2002), counsel could have utilized those motions to impeach Meddings' suppression testimony that he began cooperating with the Commonwealth in March of 2003.  Appellant simply fails to sustain his burden to prove

---

[20] Relevant to this assertion of PCRA court error, the Commonwealth contends that Appellant previously litigated his suppression claim and that previous counsel fully and effectively litigated the suppression issue.  Commonwealth's Brief at 34.

that, but for counsel's alleged failures in this regard, the outcome of the proceeding would have been different. Accordingly, this issue warrants no relief.

**Issue VI:** **"**Did the PCRA court err in denying Appellant's claim that the Commonwealth violated his constitutional rights by failing to disclose exculpatory evidence relating to three central prosecution witnesses and failing to correct these witnesses' false testimony, and that counsel was constitutionally ineffective for failing to preserve and adequately litigate this issue?" Appellant's Brief at 5.

As noted above, during Appellant's trial, the Commonwealth presented testimony from Robert Marley, James Meddings, and Steve Stephens, all of whom spent time in prison with Appellant after his arrest in late 2002. As will be discussed in more detail below, Appellant contends, *inter alia*, that the Commonwealth violated *Brady* by failing to disclose impeachment evidence concerning these witnesses, such as information regarding their criminal histories. We will begin our analysis by providing a summary of pertinent portions of these witnesses' trial testimony.

## 1. Trial Testimony

### a. Marley

Marley, who was Appellant's cellmate in January of 2003, first spoke to police regarding Appellant in February of 2003. Appellant's trial took place in late August of 2004. On direct examination, Marley testified that he currently was under parole supervision for county sentences in both Dauphin and Cumberland counties. Trial Transcript at 592. Concerning his Dauphin County supervision, Marley stated that he had been charged with seven counts of theft by deception but that he ultimately plead guilty to only one count of that charge, for which he received a sentence of six months of probation on September 11, 2003. *Id.* at 593. Marley's testimony also revealed that he previously had been convicted of tampering with records, forgery, and passing bad checks. *Id.*

Marley further testified about his Cumberland County supervision. He stated that, in 2003, he received only an 11.5 to 23-month sentence on multiple charges, including tampering with the evidence, though he faced a maximum sentence of 49 years in prison for those charges. *Id.* at 593-94. Marley maintained that no government official threatened him or made him any promises in exchange for him giving the police statements about Appellant. *Id.* at 603-04.

On cross-examination, Marley explained that he would be on parole until 2006, as long as he followed his supervision orders, which he had difficulty accomplishing in the past. *Id.* at 607. Marley also admitted to being a heroin addict and to committing crimes to support his addiction, including forgery in 1999. *Id.* at 608-11. Due to supervision revocations and new arrests, Marley faced resentencing for his forgery conviction in November of 2003, and he asked the prosecutor in Appellant's case, Attorney Chardo, to help him get out of jail. *Id.* at 612-13. Marley acknowledged that: his attorney filed a petition for release from incarceration, wherein Attorney Chardo stated that he did not oppose Marley's release; and Marley, in fact, was released from prison on November 26, 2003. *Id.* at 613. Marley also testified that Attorney Chardo spoke on his behalf at his December 10, 2003, parole violation hearing and that, following that hearing, he was released from parole and his case was closed. *Id.* at 613-14. Marley specifically admitted that Attorney Chardo got him out of jail and released from parole. *Id.* at 614.

After further questioning Marley about the full extent of Attorney Chardo's assistance in his various criminal cases, *id.* at 614-20, Appellant's counsel asked Marley about his cooperation with the Pennsylvania Attorney General's Office. Marley testified that, after he was arrested by Agent Diller of the Attorney General's Office on December 13, 2002, he began cooperating with the Attorney General in April of 2003. *Id.* at 620-

22. Marley acknowledged that: he knew that he could get himself a good deal by giving information to police; and, as a result of his cooperation with authorities, he was re-paroled in one of his cases, the case was closed, and his sentence was reduced from 20 years of incarceration to six months of probation. *Id.* at 622. Marley also admitted to sending a letter to Attorney Chardo in June of 2003, wherein he stated, *inter alia*, that he had information about Appellant and requested help with his criminal charges and with remaining incarcerated in Cumberland County Prison, rather than being transferred back to Dauphin County Prison. *Id.* at 623-25.

### b. Stephens

Stephens, who was housed in Appellant's prison block from June 3rd through June 20th of 2003, also testified as a trial witness for the Commonwealth. On direct examination, he stated that he currently was on probation in Dauphin County and that he would remain on probation until June of 2005. *Id.* at 542-43. On cross-examination, Stephens explained that he had a pending criminal charge in Dauphin County when he was in prison with Appellant. *Id.* at 549-50. Stephens admitted that: he first spoke to police concerning Appellant on June 20, 2003; his Dauphin County charge was resolved on June 23, 2003; and he was released from Dauphin County Prison on June 23rd. *Id.* at 549-52. Shortly thereafter, Stephens returned to jail in Cumberland County on a parole violation and new charge. While in Cumberland County Prison, Stephens sent a letter to Attorney Chardo on November 4, 2003, reminding Attorney Chardo that he knew details regarding the murders and asking for assistance in exchange for the information. *Id.* at 553-56. Stephens eventually testified that Attorney Chardo informed him that he would "put in a good word" for Stephens to the Dauphin County Probation Office. *Id.* at 583.

### c. Meddings

Meddings and Appellant also spent time together in the same cell block in Dauphin County Prison, and as noted above, Meddings testified for the Commonwealth at Appellant's trial. On direct examination, Meddings explained that he was arrested by federal authorities in December of 2002 and was incarcerated at Dauphin County Prison. *Id.* at 657-58. While he faced the possibility of two 20-year sentences, Meddings received only a seven-year sentence, which he was serving in a federal prison camp.[21] *Id.* Meddings testified at length regarding his cooperation with government authorities in Appellant's murder investigation. *Id.* at 665-74.

Appellant's counsel further questioned Meddings about his federal charges and confirmed that he could have received up to 40 years in prison on those charges. *Id.* at 674-75. Meddings acknowledged that he was aware of Federal Regulation 5-k-1, which apparently allows for lesser sentences if a defendant cooperates with law enforcement, and admitted that he benefitted from this program by cooperating with authorities in Appellant's case. *Id.* at 676-77. Meddings also acknowledged that his sentence could be further reduced if he continued to participate in Appellant's prosecution; he specifically admitted that he may receive an additional sentence reduction depending on Attorney Chardo's opinion of his trial testimony in Appellant's case. *Id.* at 678-80.

## 2. PCRA Proceedings

In his PCRA petition, Appellant acknowledged, to some extent, that: trial counsel utilized the aforementioned impeachment evidence at trial to elicit testimony from all three of these witnesses; the evidence and testimony demonstrated that the witnesses were convicted criminals cooperating with government officials in this case; and their cooperation led to beneficial treatment, which called their credibility into question.

---

[21] During cross-examination, Meddings testified that he was sentenced in February of 2004. Trial Transcript at 679.

Appellant nonetheless contended that the Commonwealth violated *Brady* by failing to disclose to the defense similar (and, in some instances, seemingly overlapping) impeachment evidence concerning these witnesses. PCRA Petition, 1/12/2012, at 103-14.

For instance, Appellant recognized that, "[a]t trial, it was revealed on cross-examination that Marley cooperated with the Pennsylvania Attorney General's Office in April of 2003 in exchange for leniency in his own case." *Id.* at 106. Appellant, however, contended that the Commonwealth violated *Brady* by failing to disclose that Marley also cooperated with the Commonwealth in a 1992 drug case. *Id.* (citing *Commonwealth v. Marley*, No. 215 CA 1992 (York County)).

Regarding an alleged *Brady* violation involving Stephens, despite acknowledging all of the evidence and testimony detailed above and the fact that Stephens stated at trial that Attorney Chardo never promised him anything (*see, e.g.,* Trial Transcript at 553), Appellant surmised that the circumstances strongly suggest that Attorney Chardo, in fact, promised Stephens leniency in exchange for his cooperation and that the Commonwealth violated *Brady* by failing to disclose this alleged deal. PCRA Petition, 1/12/2012, at 114.

As an example of an alleged *Brady* violation relating to Meddings, Appellant recognized that Meddings testified at trial that his cooperation in Appellant's case led to a reduction in his sentence in his federal case, but he argued that the Commonwealth violated *Brady* by failing to inform Appellant that Meddings' federal sentence was further reduced due to his cooperation with the Federal Bureau of Investigation concerning drug trafficking in West Virginia. *Id.* at 110-11.

In the alternative, Appellant argued that, if trial counsel was aware of all of the allegedly undisclosed *Brady* material or failed to obtain and use it to impeach these

witnesses, then counsel rendered ineffective assistance. *Id.* at 121-24. On September 4th and 5th of 2014, the PCRA court held a hearing to address, *inter alia*, these *Brady* and ineffective-assistance-of-counsel claims. Among others, Marley, Meddings, Stephens, and Attorney Chardo testified at the hearing. Thereafter, the PCRA court rejected Appellant's claims in its September 22, 2015, memorandum. PCRA Court Memorandum, 9/22/2015, at 9-21.

According to the court, the Commonwealth conceded that it inadvertently did not disclose to Appellant that Marley had been convicted of a summary retail theft. *Id.* at 11-12. The PCRA court deemed that error harmless, reasoning that any prejudice Appellant may have suffered as a result of that error was *de minimus*. *Id.* at 12. As to the remainder of Appellant's *Brady* claims involving Marley, relying primarily on Attorney Chardo's hearing testimony and related exhibits, the court concluded that the Commonwealth did not violate *Brady*, as claimed by Appellant. *Id.* at 12-16. In the process of reaching this conclusion, the court also found meritless Appellant's claims of ineffective assistance of counsel. *Id.*

The court similarly determined that the Commonwealth met its *Brady* obligations with regard to Stephens and Meddings and that trial counsel did not render ineffective assistance in his questioning of these witnesses, essentially because counsel employed a reasonable strategy by thoroughly and successfully cross-examining the witnesses at trial. *Id.* at 16-21.

### 3. Arguments to this Court

In his brief to this Court regarding these contentions, Appellant reiterates his various *Brady* and ineffective-assistance-of-counsel claims, and he makes a variety of allegations of error regarding the manner in which the PCRA court disposed of these issues. Appellant's Brief at 53-67. Appellant contends, *inter alia*, that the PCRA court

erred by: addressing his claims in isolation rather than considering the cumulative impact of all of the allegedly undisclosed evidence; making a number of unsupported findings of fact; and failing to address several of his assertions. *Id.* at 64-67. For its part, the Commonwealth offers an argument that essentially mirrors the rationale employed by the PCRA court in rejecting Appellant's claims. Commonwealth Brief at 36-41.

**4. Discussion**

Before discussing the merits of these claims, we pause to address, again, the troubling manner in which Appellant presents issues and arguments throughout his brief to this Court. By way of example, in an attempt to bolster his *Brady* claims, Appellant states that, in exchange for Meddings' cooperation in Appellant's case, "Meddings was assured that his mother and girlfriend would not be charged" in connection to his federal drug case. Appellant's Brief at 58 (citing N.T., 9/5/2014, at 169-71). Appellant then baldly asserts that this "promise was honored, yet never disclosed to trial counsel." *Id.*

What is most disconcerting regarding this averment is that Appellant misrepresents the record. In support of his statement regarding the alleged deal between Meddings and presumably someone from law enforcement, Appellant cites to a portion of Meddings' testimony at the September 5, 2014, PCRA hearing. Appellant's Brief at 58 (citing N.T., 9/5/2014, at 169-71). A review of that portion of the transcript, however, reveals that at no point was Meddings asked, nor did he ever testify, about a deal regarding his cooperation in Appellant's case in exchange for his fiancée and mother avoiding criminal charges. This is but one example of how the advocacy in Appellant's brief has hampered this Court's review of his myriad issues on appeal. Despite these deficiencies, we dispose of Appellant's *Brady* and ineffective-assistance-of-counsel claims as follows.

The crux of the *Brady* rule is that due process is offended when the prosecution withholds material evidence favorable to the accused. *Commonwealth v. Weiss*, 81 A.3d 767, 783 (Pa. 2013). The *Brady* rule extends to impeachment evidence including any potential understanding between the prosecution and a witness, because such information is relevant to the witness' credibility. *Id.* To establish his alleged *Brady* violations, Appellant had to prove that the Commonwealth willfully or inadvertently suppressed impeachment evidence and that prejudice ensued. *Id.*

Regarding the prejudice prong of this standard, "favorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* (citations omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 783-84 (citation omitted). "In determining if a reasonable probability of a different outcome has been demonstrated, '[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'" *Id.* at 784 (citations omitted). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish materiality in the constitutional sense." *Id.* (citation omitted). Moreover, as explained above, for purposes of his claims of ineffective assistance of counsel, Appellant was required to demonstrate, *inter alia*, that he suffered prejudice as a result of counsel's deficient performance, "that is, a reasonable probability that but for counsel's act or omission, the outcome of the proceeding would have been different." *Cooper*, 941 A.2d at 664.

Assuming *arguendo* that the Commonwealth failed to disclose the aforementioned impeachment evidence, there is perhaps some possibility that the evidence would have been favorable to Appellant's case. However, Appellant has failed to meet his burden of demonstrating the necessary level of prejudice to establish an overarching *Brady* violation. As suggested above, through discovery, trial counsel was able to gather evidence which revealed that Marley, Stephens, and Meddings were convicted criminals with ongoing legal issues who had incentives to provide information to the Commonwealth, and that the witnesses could and, to some extent, did benefit from cooperating with the Commonwealth in this case.

The record indicates that counsel utilized this evidence to challenge forcefully these witnesses' credibility. Indeed, counsel seized upon the impeachment evidence and the witnesses' trial testimony during his guilt-phase closing arguments, where he attacked the jailhouse witnesses' credibility and characterized them as criminals eager to assist the Commonwealth for their personal benefit. Trial Transcript at 1034-40; *id.* at 1046-49. Given the breadth of the impeachment evidence disclosed, discovered and used effectively, anything unknown to the defense can be characterized as *de minimus* and would have been cumulative. There is no reasonable potentiality that another example or two of these witnesses' rewards for their cooperation would have changed the jurors' view of their credibility. For these reasons, we are unpersuaded that, in the absence of any further impeachment evidence regarding these witnesses, Appellant did not receive a fair trial. In other words, Appellant has failed to demonstrate that, in the absence of this evidence, the jury's verdicts are unworthy of confidence.

Concomitantly, to the extent that trial counsel knew of or should have discovered any of this alleged *Brady* material and failed to utilize it to Appellant's satisfaction, we discern no prejudice to Appellant, as that term is understood within the ineffective-

assistance-of-counsel standard, for all of the same reasons explored in our rejection of Appellant's due process/*Brady* contentions. Because counsel thoroughly attacked these witnesses' credibility as described above, we are unconvinced that, but for any failure by counsel to undermine further these witnesses' credibility, there is a reasonable probability that the outcome of Appellant's trial would have been different. This issue, therefore, warrants no relief.

**Issue VII:** "Did the PCRA court err in denying Appellant's claim that the prosecutor engaged in repeated acts of misconduct pretrial and at trial in violation of his constitutional rights, [and] that prior counsel were ineffective for failing to preserve and adequately litigate this issue?" Appellant's Brief at 5.

In his PCRA petition and brief to this Court, Appellant alleges that, pre-trial and during trial, the prosecutor committed a litany of acts which qualify as misconduct. PCRA Petition, 1/12/2012, at 234-37; Appellant's Brief at 67-70. Several of these claims of misconduct are re-stylized issues that Appellant raised elsewhere in his petition and appellate brief. For instance, under Appellant's "Issue VI," we rejected his argument that the Commonwealth violated *Brady* by failing to disclose that the prosecutor allegedly made deals with jailhouse witnesses who testified at Appellant's trial. *Supra* at 26-35. In argument on the present issue, Appellant baldly asserts that this failure-to-disclose constitutes prosecutorial misconduct. PCRA Petition, 1/12/2012, at 234-35; Appellant's Brief at 68. Appellant also recasts the previously discussed claims regarding the expert trial testimony of Kersten Jackson (handwriting analysis expert) and Dr. Ross (pathologist), *see supra* at 14-21, by now suggesting that the prosecutor committed misconduct by presenting these witnesses' allegedly unreliable forensic testimony. PCRA Petition, 1/12/2012, at 235; Appellant's Brief at 68-69.

Appellant then bolsters his claims of prosecutorial misconduct by averring that, during closing arguments, the prosecutor "argued well beyond the bounds of the

evidence, misstated the law and improperly vouched for the credibility of Commonwealth witnesses." PCRA Petition, 1/12/2012, at 235; Appellant's Brief at 69. Lastly, Appellant, in cursory fashion, takes the position that trial and appellate counsel rendered ineffective assistance by failing to raise or litigate properly these claims of prosecutorial misconduct. PCRA Petition, 1/12/2012, at 237-39; Appellant's Brief at 70-71. In response, the Commonwealth argues, in part, that several of Appellant's claims of prosecutorial misconduct are waived because he failed to develop them properly.[22] Commonwealth's Brief at 41-42.

Appellant is not entitled to relief on these claims. The Rules of Appellate Procedure require appellants to support their arguments with pertinent discussion and citation to authority. Pa.R.A.P. 2119(a). Contrary to this rule, Appellant's arguments are undeveloped and are supported, in significant part, by references to arguments made elsewhere in his brief. *See, e.g.*, Appellant's Brief at 68 ("As argued above in Claim VI, the Commonwealth made secret deals with at least three jailhouse cooperators to gain their testimony against Appellant."). Regarding citation to pertinent authority, Appellant's brief makes passing mention of only one proposition of law, namely, that courts "must consider the 'cumulative effect' of each instance of misconduct on Appellant's trial."[23] Appellant's Brief at 68. While this principle may be true, it fails to lend legal support to any of the individual instances of misconduct alleged

---

[22] The PCRA court rejected Appellant's claims of prosecutorial misconduct without holding an evidentiary hearing. PCRA Court Memorandum, 1/8/2013, at 55-58. Given the manner in which we dispose of this issue, we need not summarize the court's reasons for rejecting the claims.

[23] In support of this proposition of law, Appellant provides an erroneous citation, as follows: "*Commonwealth v. Anderson*, 38 A.3d 828, 839 (Pa. 2011)." Appellant, thus, represents that *Anderson* is an opinion from this Court, when in fact the opinion in *Anderson* is the product of the Superior Court.

by Appellant, none of which are facially meritorious. Aggregating these undeveloped claims does not transform them into claims worthy of this Court's intervention. Having failed to offer a developed argument for any specific instance of prosecutorial misconduct and having failed to raise a persuasive contention of cumulative prejudice, Appellant's arguments fail. This issue, therefore, warrants no further consideration.

**Issue VIII:** "Did the PCRA court err in denying Appellant's claim that the trial court improperly struck a potential juror for cause, and that appellate counsel was ineffective for failing to raise and litigate this issue on direct appeal?" Appellant's Brief at 5-6.

Richard Badesso was a potential juror for Appellant's trial. When questioned by the prosecutor during *voir dire*, Badesso indicated that he had a moral, religious, and ethical belief that would prevent him from considering the death penalty. N.T., 6/2/2004, at 149. The prosecutor asked Badesso, "Is your opposition to the death penalty such that you would feel morally compelled, in spite of the law, to vote against the death penalty regardless of the facts of the case?" *Id.* Badesso responded, "It would be difficult for me morally to do that, yes." *Id.* He further expressed that his moral beliefs would substantially impair his ability to discharge his duty as a juror if the law called for the imposition of the death penalty. *Id.* at 150-51. Accordingly, the prosecutor moved to excuse Badesso for cause. *Id.* at 151.

When questioned by Appellant's counsel, Badesso explained that he thought he would be able to follow directions and guidelines but that it would be difficult for him to impose the death penalty. *Id.* Badesso became confused when trial counsel explained how Badesso would be required to discharge his duties, but after additional explanation, Badesso stated that he could probably impose the death penalty in a case like the Oklahoma City bombing. *Id.* at 151-53. When trial counsel asked Badesso whether he would have to make his decision based upon the specific case and evidence, he

responded, "Yes." *Id.* at 153. Trial counsel, therefore, opposed the challenge for cause; however, the trial court ultimately granted the Commonwealth's motion and excused Badesso. *Id.* at 153-54. Appellant did not challenge this determination on direct appeal.

In his PCRA petition, Appellant claimed that appellate counsel was ineffective for failing to argue on direct appeal that the trial court erred by excusing Badesso for cause. PCRA Petition, 1/12/2012, at 124-34. In terms of the arguable merit prong of his claim, Appellant primarily relied upon *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968), wherein the United States Supreme Court held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." Appellant posited that Badesso's answers to trial counsel's questions revealed that he could set aside his personal beliefs regarding the death penalty and follow the law as instructed. PCRA Petition, 1/12/2012, at 130-31. Thus, in Appellant's view, the trial court improperly excluded Badesso from the jury as he simply voiced personal objections to the death penalty. *Id.* at 132.

The PCRA court disposed of this issue without holding an evidentiary hearing. In so doing, the court observed that this Court has consistently held that it is not unconstitutional to exclude potential jurors who are morally opposed to the death penalty. PCRA Court Memorandum, 1/8/2013, at 29-30 (citing, *inter alia*, *Commonwealth v. Hudson*, 314 A.2d 231 (Pa. 1974)). Moreover, according to the PCRA court, the United States Supreme Court has abandoned the *Witherspoon* standard in favor of the view that "a juror may not be challenged for cause based on his views about capital punishment *unless those views would prevent or substantially*

*impair* the performance of his duties as a juror in accordance with his instructions and his oath." PCRA Court Memorandum, 1/8/2013, at 30 (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)) (emphasis added by the PCRA court). The PCRA court opined that the trial court properly struck Badesso for cause because he stated that his beliefs regarding the death penalty would substantially impair his ability to impose the death penalty, even if the law called for such a sentence. *Id.*

In his brief to this Court, Appellant renews his claim that appellate counsel was ineffective for failing to argue on direct appeal that the trial court erred by excusing Badesso for cause. Appellant's Brief at 72-74. In terms of the PCRA court's rationale for rejecting this claim, Appellant submits that the "court misinterpreted the law and insufficiently examined the relevant facts." *Id.* at 74. As to the law, Appellant contends that the PCRA court improperly relied upon cases from this Court, such as *Hudson*. According to Appellant, those cases are irrelevant to this matter because the juries in those cases imposed sentences of life in prison, not death. *Id.* Regarding the facts, Appellant insists that the PCRA court ignored that, when questioned by trial counsel, Badesso expressed that he would be able to act in accordance with the law and his oath. *Id.* at 74-75. The Commonwealth, on the other hand, takes the position that Badesso stated that he believed his ability to discharge his duty as a juror would be substantially impaired if the law called for the death penalty; accordingly, in the Commonwealth's view, the trial court properly excused him for cause. Commonwealth's Brief at 44.

As this Court recently explained, the United States Supreme Court has "clarified that an individual may be excused for cause whenever his views on capital punishment 'would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Commonwealth v. Baumhammers*, 92

A.3d 708, 740 (Pa. 2014) (quoting *Wainwright v. Witt*, 469 U.S. 412, 424 (1985)). This Court has elaborated that a "juror's bias need not be proven with unmistakable clarity." *Baumhammers*, 92 A.3d at 741 (quoting *Commonwealth v. Morales*, 701 A.2d 516, 525 (Pa. 1997)). Importantly, "the decision whether to disqualify a juror for cause lies within the sound discretion of the trial court and error will not be found absent an abuse of discretion."[24] *Baumhammers*, 92 A.3d at 740.

Badesso's responses during *voir dire* demonstrate that his moral beliefs would substantially impair his ability to discharge his duty as a juror if the law called for the imposition of the death penalty. N.T., 6/2/2004, at 149. This undeniably meets the *Witt* standard for disqualification of a juror in a capital case. To the extent that Badesso's responses were equivocal, we are satisfied that the trial court appropriately exercised its discretion by resolving any credibility issues and by granting the Commonwealth's

---

[24] This Court noted the following in *Baumhammers*:

> In *Witt*, the Supreme Court clarified that the governing standard, whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath:
>
>> does not require that a juror's bias be proved with unmistakable clarity. This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made unmistakably clear; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. [T]his is why deference must be paid to the trial judge who sees and hears the juror.

*Baumhammers*, 92 A.3d at 741 n.24 (quoting *Witt*, 469 U.S. at 424-25).

motion to excuse Badesso for cause. *See Baumhammers*, 92 A.3d at 742 (explaining that venirepersons' "equivocal answers and serious apprehensions about imposing the death penalty . . . are adequate . . . to support a conclusion by the trial court that the *Witt* standard was satisfied - particularly in light of the deference accorded to the common pleas court in these types of decisions"); *Commonwealth v. Gibson*, 951 A.2d 1110, 1129–30 (Pa. 2008) (agreeing with the Commonwealth's position that, when a trial court is called upon to determine whether to excuse a juror for cause when death-qualifying a jury, "it was within the trial court's discretion to resolve the credibility issue arising from the prospective juror's contradictory responses"). For these reasons, Appellant's claim that appellate counsel rendered ineffective assistance fails for lack of arguable merit.

**Issue IX.:** "Did the PCRA court err in denying Appellant's claim that the trial court denied his right to present a defense and violated Pa.R.E. 803(2) by excluding an 'excited utterance' made by Appellant, and that appellate counsel was ineffective for failing to federalize this claim?" Appellant's Brief at 6.

Appellant's brother, Scott, testified for the Commonwealth at trial. His testimony revealed that, on the night of the murders, he and Appellant drove from their home in Cambria County to Jean's residence in Middletown. Upon arriving at the home in Middletown, Appellant exited the vehicle, and Scott remained behind. During cross-examination, Appellant's counsel elicited testimony from Scott about Appellant's demeanor when he returned to the vehicle. According to Scott, Appellant was nervous and upset. Trial Transcript at 409. Counsel then asked Scott if Appellant said anything to him.

At that point, the trial court held a sidebar discussion. The prosecutor reminded the court that, pre-trial, it had ruled as inadmissible a statement that Scott previously had attributed to Appellant at the time he re-entered the vehicle, specifically, "I only

looked in the window, and you won't believe what I saw[.]" *Id.* at 410. Trial counsel argued that the statement was admissible under the excited utterance exception to the hearsay rule. *Id.* The trial court allowed Appellant's counsel the opportunity to lay a foundation for his question. Counsel attempted to do so and eventually asked Scott again if Appellant said something to him when he returned to the vehicle. *Id.* at 413. The Commonwealth objected, and the court sustained the objection. *Id.*

On direct appeal to this Court, Appellant argued that the trial court erred by precluding him from introducing the statement Appellant allegedly made to Scott under the present sense impression or excited utterance exceptions to the hearsay rule. *Wholaver*, 989 A.2d at 906. Because Appellant failed to argue the present sense impression exception at trial, we found that portion of his argument to be waived. *Id.* at 906 n.19. As to Appellant's argument regarding the excited utterance exception, this Court concluded that the trial court did not abuse its discretion by excluding this statement. *Id.* at 907.

In his PCRA petition, Appellant contended that appellate counsel "was ineffective for failing to raise and litigate the federal constitutional grounds for admissibility of" Appellant's alleged statement to Scott. PCRA Petition, 1/12/2012, at 175. The PCRA court denied this claim without holding an evidentiary hearing. The court highlighted that Appellant previously litigated the underlying issue of the admissibility of his statement on direct appeal and that Appellant failed to assert what federal constitutional grounds his appellate counsel could have raised on direct appeal. PCRA Court Memorandum, 1/8/2013, at 40-41.

In his brief to this Court, Appellant asserts that appellate counsel failed to argue that the trial court's ruling violated his constitutional rights to due process and to present a defense. Appellant's Brief at 76. He also seems to suggest that appellate counsel

should have argued that his statement was admissible because it was probative of his claim of innocence. *Id.* at 76-77. The Commonwealth maintains, *inter alia*, that Appellant has waived this issue by failing to develop it appropriately. Commonwealth's Brief at 45.

Appellant fails to appreciate that trial counsel's sole argument at trial was that Appellant's alleged statement to Scott was admissible as an excited utterance. Trial counsel did not seek admission of this statement under the various theories that Appellant now presents. Thus, had appellate counsel raised those theories of admissibility on appeal, this Court would have deemed them waived. Pa.R.A.P. 302(a) ("Issues not raised in lower court are waived and cannot be raised for first time on appeal."). Accordingly, Appellant's claim that appellate counsel was ineffective for failing to pursue these issues on direct appeal lacks arguable merit.

**Issue X:** "Did the PCRA court err in denying Appellant's claim that he was denied due process because the court failed to instruct the jury that Scott Wholaver was a corrupt and polluted source, and by giving a defective reasonable doubt instruction, and that trial counsel was ineffective in relation to these errors?" Appellant's Brief at 6.

Under this issue, Appellant raises two claims of ineffective assistance of trial counsel, both relating to the trial court's guilt-phase instructions to the jury. More specifically, Appellant contends that trial counsel rendered ineffective assistance by failing to request that the trial court give the jury a "corrupt and polluted source" instruction regarding Scott's trial testimony. In addition, Appellant maintains that the trial court's "reasonable doubt" instruction was erroneous and that counsel was ineffective for failing to object.

## 1. Corrupt and Polluted Source Jury Instruction

As noted above, Appellant's brother Scott testified for the Commonwealth at trial. In short, Scott's testimony revealed, *inter alia*, that he accompanied Appellant on the

night and morning of the murders, though Scott maintained at trial that he did not know that Appellant killed the victims. Prior to Appellant's trial, Scott pled guilty to three counts of third-degree murder and to burglary and criminal conspiracy, in connection with the killings of Jean, Victoria, and Elizabeth.

In his PCRA petition, Appellant took the position that, because Scott was an accomplice to the murders, trial counsel was ineffective for failing to ask the trial court to give the jury a "corrupt and polluted source" instruction regarding Scott's trial testimony. PCRA Petition, 1/12/2012, at 208-11. Such an instruction is required when an accomplice's testimony implicates the defendant; the instruction informs the jury "that the accomplice is a corrupt and polluted source whose testimony should be viewed with great caution." *Commonwealth v. Smith*, 17 A.3d 873, 906 (Pa. 2011) (quoting *Commonwealth v. Chmiel*, 639 A.2d 9, 13 (Pa. 1994)). This instruction is necessary if the trial evidence is sufficient to present an inference that a Commonwealth witness was an accomplice.[25] *Smith*, 17 A.3d at 906.

---

[25] The Crimes Code defines "accomplice" as follows:

**(c) Accomplice defined.--**A person is an accomplice of another person in the commission of an offense if:

(1) with the intent of promoting or facilitating the commission of the offense, he:

(i) solicits such other person to commit it; or

(ii) aids or agrees or attempts to aid such other person in planning or committing it; or

(2) his conduct is expressly declared by law to establish his complicity.

18 Pa.C.S. § 306.

The PCRA court rejected this claim without holding an evidentiary hearing. The court first reasoned that, because Scott was not an accomplice to the murders, there was no need to provide the jury with a "corrupt and polluted source" instruction. PCRA Court Memorandum, 1/8/2013, at 51-52. The court also concluded that the instruction was unnecessary because Scott's testimony was corroborated by other evidence presented at trial. *Id.* (citing *Commonwealth v. Johnson*, 416 A.2d 1065, 1068 (Pa. Super. 1979) (explaining that the "corrupt and polluted source" instruction "pertains only to the uncorroborated testimony of an accomplice")).

In his brief to this Court, Appellant contends that the PCRA court erred by concluding that Scott was not an accomplice to the murders. Appellant's Brief at 81. Appellant, however, fails to address the PCRA court's additional conclusion that a "corrupt and polluted source" instruction was unnecessary because Scott's testimony was corroborated by other evidence of record.[26] Putting aside Appellant's failure in this regard and assuming *arguendo* that Appellant's claim has arguable merit, for the reasons that follow, Appellant's bald assertion of prejudice does not entitle him to PCRA relief. *See* Appellant's Brief at 80 ("Counsel's failure with regard to these charges prejudiced Appellant. Had the jury been charged correctly, there is a reasonable probability of a different outcome.").

As an initial matter, Scott's testimony on both direct and cross-examination fully apprised the jury that he had an interest in testifying for the Commonwealth. Specifically, Scott's testimony on direct examination revealed that he had entered into a plea agreement whereby he agreed to plead guilty to three counts of third-degree murder and to one count each of burglary and criminal conspiracy. Trial Transcript at

---

[26] The Commonwealth's argument tracts the PCRA court's rationale for rejecting Appellant's claim. Commonwealth's Brief at 45-46.

320-21. For one count of third-degree murder, Scott already had received a sentence of 12.5 to 25 years in prison, and his sentences on the remaining counts remained pending. *Id.*

During cross-examination, Scott conceded that, as part of his plea agreement, he was required to testify for the Commonwealth and that, if the prosecutor found his trial testimony to be untruthful, then his plea agreement would be cancelled. *Id.* at 401-03 and 430. Scott also testified that, if his testimony satisfied the prosecutor, then his sentences on his remaining charges would run concurrently with his already-established sentence of 12.5 to 25 years in prison; thus, Scott acknowledged that his agreement contemplated that he would receive an aggregate sentence of 12.5 to 25 years in prison, despite that he otherwise faced up to 160 years in prison. *Id.* at 432-33.

In addition to the jury being aware of Scott's interest in testifying for the Commonwealth, the trial court provided the jury with general instructions regarding how to assess witnesses' testimony. For instance, the court instructed the jury that they were the sole judges of the credibility of witnesses and that they must decide whether to believe witnesses' testimony. *Id.* at 1100. In providing factors for the jury to consider when assessing the credibility of a witness, the court instructed the jury to contemplate, *inter alia*, whether the witness had "any interest in the outcome of the case, any bias, prejudice, or other motive that may affect his testimony including the fact that they had entered into a plea bargain as part of their indication that they would testify in this case." *Id.* at 1100-01. We further observe that the trial court instructed the jury that Appellant was charged with entering into a conspiracy with Scott. *Id.* at 1121-24.

Given the trial court's instructions to the jury and the fact that the jury was fully aware of Scott's interest in testifying for the Commonwealth, we conclude that Appellant has failed to establish that, but for counsel's failure to seek and obtain a "corrupt and

polluted source" jury instruction, there was a reasonable probability that the outcome of his trial would have been different. *See also Smith*, 17 A.3d at 904-07 (concluding that, in light of the totality of the jury charge and the trial evidence demonstrating the appellant's accomplices' interest in testifying for the Commonwealth, the appellant failed to establish the prejudice prong of his claim that appellate counsel was ineffective for not pursuing a claim regarding a "corrupt and polluted source" instruction). Consequently, this claim of ineffective assistance of counsel warrants no relief.

2**. Reasonable Doubt Jury Instruction.**

The trial court provided the jury with a fairly lengthy instruction regarding the Commonwealth's burden to prove Appellant guilty beyond a reasonable doubt. Trial Transcript at 1097-99. Regarding the concept of "reasonable doubt," the court explained as follows.

> Although the Commonwealth has the burden of proving the Defendant guilty, this does not mean they must prove their case beyond all doubt or to a mathematical certainty, nor must it demonstrate the complete impossibility of innocence. A reasonable doubt is a doubt that would **restrain** a reasonable careful and sensible person from acting upon a matter of importance in his or her own affairs. A reasonable doubt must fairly arise out of the evidence that was presented or out of the lack of evidence presented with respect to some element of the crime.
>
> A reasonable doubt must be a real doubt. It may not be an imagined one, nor may it be a doubt manufactured to avoid carrying out an unpleasant duty. A reasonable doubt is not merely an imagined or passing fancy that may come into the minds of a juror. It must be a doubt arising from the evidence that is **substantial** and well founded on reason, thinking and common sense. **A reasonable doubt is something different and much more serious than a possible doubt.**

*Id.* at 1098 (emphasis added).

In his PCRA petition, Appellant maintained that this instruction was improper in several respects and that trial counsel was ineffective for failing to object to the instruction. PCRA Petition, 1/12/2012, at 212-15. Appellant's most prominent argument

regarding the instruction was that the court erred by utilizing the word "restrain," as emphasized above, rather than "hesitate." *Id.* at 213-14. However, relevant to this appeal, Appellant also added a cursory argument that the court erred by stating that a doubt must be "substantial" and by explaining that a "reasonable doubt is something different and much more serious than a possible doubt." *Id.* at 214. Appellant contended that this portion of the instruction amounted to a requirement that the jury had to be certain that Appellant was innocent to acquit him. *Id.* In other words, Appellant posited that the court's instruction improperly lessened the Commonwealth's burden of proof.

The PCRA court disposed of this claim without holding an evidentiary hearing. In so doing, the court focused its attention on Appellant's primary argument, *i.e.*, that the court erred by utilizing "restrain" rather than "hesitate" in its reasonable doubt instruction. PCRA Court Memorandum, 1/8/2013, at 52. In this regard, the court properly observed that this Court has rejected this argument. *Id.* (citing *Commonwealth v. Clark*, 961 A.2d 80, 95 (Pa. 2008)).

In his brief to this Court, Appellant abandons the primary argument that he raised in his PCRA petition. He, instead, focuses on the cursory argument mentioned above, *i.e.*, that the court erred by stating that a doubt must be "substantial" and by explaining that a "reasonable doubt is something different and much more serious than a possible doubt." In terms of error on the part of PCRA court, Appellant complains that the court "did not specifically address Appellant's claim that the reasonable doubt instruction violated Due Process, and that counsel was ineffective in failing to object."[27] Appellant's Brief at 81.

---

[27] As to this issue, the Commonwealth simply states, "With regard to the trial court's reasonable doubt instruction, the word 'restrain' is a permissible alternative to the word 'hesitate.'" Commonwealth's Brief at 46 (citing *Clark*, *supra*).

As our summary of the PCRA court's memorandum makes clear, this contention is unsupported. While the court did not specifically address every nuance of Appellant's claim, it certainly addressed and properly rejected his chief objection to the trial court's reasonable doubt instruction. We can hardly fault the PCRA court for not teasing out every aspect of each of Appellant's issues, given that his PCRA petition and various supplements span nearly 300 pages. In any event, for the reasons that follow, this claim warrants no relief.

"In general, we will not evaluate the adequacy of the instructions based on isolated references; rather, the charge is reviewed as a whole, with deference accorded the trial court's discretion in phrasing its instructions." *Commonwealth v. Hughes*, 865 A.2d 761, 788 (Pa. 2004). The appellant in *Hughes* presented a nearly identical argument as Appellant raises here. Hughes contended that the trial court's "reasonable doubt" instruction lessened the Commonwealth's burden of proof by improperly characterizing reasonable doubt "as being substantial, one that clouds the judgment, and much more serious than a possible doubt." *Id.* at 789 (footnote omitted). The Court rejected this argument, explaining,

> While it would have been preferable for the trial court to avoid using the term "substantial" in its reasonable doubt charge, *see Victor v. Nebraska*, 511 U.S. 1, 19–20, 114 S.Ct. 1239, 1250, 127 L.Ed.2d 583 (1994), the court's instruction is virtually identical to that which this Court upheld in both *Commonwealth v. Murphy*, 559 Pa. 71, 82–84, 739 A.2d 141, 147–48 (1999), and *Commonwealth v. Stokes*, 532 Pa. 242, 253–54, 615 A.2d 704, 709–10 (1992). Here, as explained in *Murphy*, the reference to "substantial" was designed to distinguish the concept of reasonable doubt from that of an imaginary or possible doubt. *Accord Victor*, 511 U.S. at 20, 114 S.Ct. at 1250. Thus, trial counsel cannot be deemed ineffective for failing to challenge the reasonable doubt instruction on direct appeal.

*Id.* at 790.

After reviewing the trial court's jury charge as a whole, and relying on *Hughes,* we conclude that Appellant's claim that the reasonable doubt instruction was improper

lacks merit. Consequently, counsel cannot be deemed ineffective for not objecting to the court's instruction. Thus, this claim warrants no relief.

**Issue XI:** "Did the PCRA court err in denying Appellant's claim that trial counsel was ineffective for conceding his guilt to the solicitation charge?" Appellant's Brief at 6.

The Commonwealth presented trial testimony from several witnesses who indicated that Appellant entered into a scheme to hire a hitman to kill Ramos, Victoria's boyfriend and baby Madison's father. As discussed above, one of those witnesses was James Meddings, who testified that, while he was imprisoned with Appellant, Appellant informed him of his desire to hire someone to kill Ramos. Trial Transcript at 663. Meddings provided this information to authorities and agreed to cooperate with the investigation into the murders of Appellant's family members. *Id.* at 666. With Meddings' help, Appellant communicated *via* letter, to a person he believed was a hitman, his desire to have Ramos killed. Unbeknownst to Appellant, the recipient of the letter was not a hitman; rather, it was Drug Enforcement Administration Agent Jack Luikart, who also testified about this arrangement at Appellant's trial. *Id.* at 708-18. Also relevant to this issue is that, throughout the trial, Appellant's counsel suggested that Jeffrey Martin, Victoria's ex-boyfriend, killed the victims.

During closing arguments, trial counsel conceded that Appellant solicited the murder of Ramos, stating as follows.

> I am telling you right now, those people are telling the truth. He made those calls. He wrote that letter. He wanted to take care of the person that he thought murdered his daughter because he knew he didn't do it. And someone else did and he picked the most viable suspect and then he was blinded. He used bad information, incomplete evidence, and a bogus theory to try to eliminate Frankie Ramos. . . .

Trial Transcript at 1049. Counsel then provided a lengthy argument in support of the theory that Martin was the actual killer, not Ramos as Appellant previously, but mistakenly, believed. *Id.* at 1050-62.

In his PCRA petition, Appellant argued that trial counsel was ineffective for conceding his guilt to the solicitation-of-murder charge without Appellant's consent. PCRA Petition, 1/12/2012, at 202-07. Appellant posited that counsel could have no reasonable strategic basis for conceding his guilt to solicitation because, *inter alia*, any suggestion that he wished to kill Ramos as revenge for Ramos murdering Appellant's family "contradicted the defense to the murder charges actually presented by counsel - that Jeffrey Martin killed Jean, Victoria and Elizabeth Wholaver." *Id.* at 206. The PCRA court held an evidentiary hearing on the issue. Trial counsel was the sole witness at that hearing.

Regarding this issue, trial counsel testified that Appellant informed him that he did attempt to have Ramos killed. N.T., 9/6/2013, at 135. According to counsel, Appellant stated that he did so because he believed that Ramos was responsible for murdering his family. *Id.* Counsel further testified that, given the strength of the evidence demonstrating that Appellant did solicit the murder of Ramos, he decided to use the solicitation letter in Appellant's favor as it could be understood to suggest that Appellant believed someone else (Ramos) committed the murders. *Id.* at 111-12. Counsel stated that he discussed this strategy with Appellant. *Id.* at 136. When asked whether Appellant agreed with the strategy, trial counsel explained, "[Appellant] was the kind of client that let me run the case. And when I had a recommendation to him, his response was generally, if not consistently, 'Whatever you think is best. Do whatever is best.' That's what I did." *Id.* at 136-37. Counsel was then asked whether that was the

case as it related to conceding the solicitation charge, to which counsel answered, "I believe it was." *Id.* at 137.

Based upon this testimony, the PCRA court rejected Appellant's claim of ineffective assistance of counsel. PCRA Court Memorandum, 3/31/2014, at 10-12. In so doing, the court summarized counsel's testimony, including his statement that he received Appellant's consent to concede his guilt to the solicitation charge. *Id.* at 11. The court then concluded that counsel had a reasonable basis for employing this strategy - acknowledging Appellant's authorship of the letter shifted the blame for the murder onto Ramos. *Id.* In reaching this conclusion, the court implicitly credited counsel's testimony.

In his brief to this Court, Appellant offers a cursory argument that the PCRA court erred by rejecting his claim. Appellant asserts,

> That Appellant may have believed Ramos was the killer did not bolster Appellant's defense in the murder case; rather, it conflicted with it. Trial counsel argued that Martin, not Ramos, was responsible for the murders. Arguing that Appellant believed that Ramos was the killer and then presenting a defense that Martin was the killer made Appellant seem desperate and insincere.

Appellant's Brief at 86.[28]

The crux of the claim that Appellant raised in his PCRA petition was that counsel rendered ineffective assistance by conceding his guilt to the solicitation charge without his permission. The record, specifically trial counsel's testimony, undermines this claim, as it demonstrates that counsel received Appellant's permission to concede his guilt to the solicitation charge. The PCRA court credited counsel's testimony, and because the

---

[28] In its brief, the Commonwealth maintains that Appellant consented to counsel's decision to concede his guilt to solicitation and, therefore, that Appellant's claim of ineffective assistance of counsel is meritless. Commonwealth's Brief at 46-47.

record supports the PCRA court's credibility determination, we are bound by it. *Mason*, *supra*. Moreover, there was no apparent conflict or contradiction between counsel's decision to defend Appellant by implicating Martin for the murders and counsel's attempt to utilize the solicitation letter to show that Appellant could not have committed the murders because he initially, but mistakenly, believed that Ramos killed his family members. For these reasons, the PCRA court did not err by rejecting this claim of ineffective assistance of counsel.

**Issue XII:** "Did the PCRA court err in denying Appellant's claim that the trial court's penalty phase instructions, both individually and cumulatively, denied Appellant a fair and reliable sentencing hearing, and that trial counsel was ineffective for failing to object?" Appellant's Brief at 7.

In his PCRA petition, Appellant claimed that trial counsel rendered ineffective assistance by failing to object to several aspects of the trial court's penalty-phase jury instruction. Appellant first argued that the trial court's instruction regarding the "while in the perpetration of a felony" aggravating circumstance, 42 Pa.C.S. § 9711(d)(6), erroneously failed to define: (1) the elements of burglary, *i.e.*, the felony Appellant perpetrated while committing the killings; (2) the actual phrase "while in the perpetration of a felony"; and (3) "felony." PCRA Petition, 1/12/2012, at 140-41. Next, as to the "grave risk of death to another person" aggravator, 42 Pa.C.S. § 9711(d)(7), Appellant contended that the court improperly failed to define the phrase "grave risk of death." *Id.* at 143-44. Third, Appellant posited that the trial court's instruction concerning the "no significant history of prior criminal convictions" mitigating circumstance, 42 Pa.C.S. § 9711(e)(1), was misguided insomuch as the court did not inform the jury that, when considering this circumstance, they must disregard any evidence related to the sexual crimes for which Appellant was acquitted. *Id.* at 146-47. Fourth, while acknowledging that the court instructed the jury that, to sentence him to death, they had to determine

that the aggravating circumstances outweigh the mitigating circumstances, Appellant relied upon *Ring v. Arizona*, 536 U.S. 584 (2002), and contended that the court's instruction was in error because it failed to inform the jury that they must find that the aggravators outweighed the mitigators beyond a reasonable doubt to sentence Appellant to death. *Id.* at 149-51. Lastly, Appellant maintained that the trial court improperly instructed the jury that they could consider Appellant's "future dangerousness" as an aggravating circumstance, as "future dangerousness" is not an aggravating circumstance in Pennsylvania, *see* 42 Pa.C.S. § 9711(d) (enumerating Pennsylvania's aggravating circumstances).[29] *Id.* at 155-58.

Without holding an evidentiary hearing on the issue, the PCRA court rejected these five claims of ineffective assistance of counsel. Regarding the concerns Appellant raised in connection to the "while in the perpetration of a felony" aggravator, the court highlighted that the trial court instructed the jury on every element of burglary during the guilt phase of trial, which occurred the day before the court charged the jury in the penalty phase. PCRA Court Memorandum, 1/8/2013, at 33. The court opined that it was unnecessary "to reiterate the elements of a crime that the same jury convicted [Appellant] of only one-day earlier." *Id.* As to the definition of the phrase "while in perpetration of a felony," the court noted that Appellant failed to elaborate on how the trial court should have defined the phrase. *Id.* Turning to the second claim challenging the "grave risk of death to another person" instruction, according to the PCRA court, this Court has determined that juries are capable of understanding the meaning of "grave risk of death" without having it further defined. *Id.* at 34 (citing

---

[29] As to this allegation of trial court error, which will be discussed in more detail below, Appellant maintained that counsel was ineffective for requesting this instruction, as well as for failing to object to it.

*Commonwealth v. Wharton*, 607 A.2d 710, 723 (Pa. 1992) (holding that the phrase "grave risk of death to another person" is not unconstitutionally vague)).

The PCRA court next rejected Appellant's third challenge to the instruction relating to the "no significant history of prior criminal convictions" mitigator. The court concluded that the claim is meritless, as the trial court specifically instructed the jury that Appellant had no prior criminal convictions. PCRA Court Memorandum, 1/8/2013, at 34. Fourth, the court determined that the trial court properly instructed the jury on the manner in which to weigh the aggravating and mitigating circumstances. *Id.* at 34-35. Lastly, the PCRA court concluded that, contrary to Appellant's contention, the trial court did not instruct the jury that "future dangerousness" was an aggravating circumstance that they could consider for purposes of sentencing. *Id.* at 36-37.

In his brief to this Court, Appellant contends that the PCRA court erred by failing to find counsel ineffective in these five circumstances. Appellant's Brief at 86-94. As an initial matter, Appellant asserts generally that the court committed legal error by dismissing each claim individually, rather than "considering the cumulative impact of the errors." *Id.* at 92-93. Next, Appellant suggests that the court made errors in its evaluation of his individual claims. In this regard, Appellant insists that the court "repeatedly dismissed [his] claims of impropriety by simply stating that the particular charge at issue accorded with the Pennsylvania Suggested Standard Criminal Jury Instructions or the Sentencing Code." *Id.* at 93. According to Appellant, such reasoning is insufficient to reject his arguments. *Id.*

Appellant also renews his position that the trial court's instruction was in error because it failed to inform the jury that to sentence Appellant to death they must find that the aggravators outweigh the mitigators beyond a reasonable doubt. *Id.* at 94. Related to his final claim as to the trial court's reference to his "future dangerousness,"

Appellant suggests that the jury necessarily understood a portion of the jury instruction, discussed in detail *infra*, to mean that they should consider Appellant's "future dangerousness" as an aggravating circumstance.[30]  *Id.* at 93-94.

We will address Appellant's concerns *seriatim*.  Before doing so, we note the following general principles of law.  This Court reviews penalty-phase jury instructions in the same manner in which it reviews challenges to jury charges given during the guilt phase of trial; we consider the entire charge, not just discrete portions of the instruction. *Commonwealth v. Eichinger*, 915 A.2d 1122, 1138 (Pa. 2007).  We further observe that trial courts are free to use their own expressions as long as the concepts at issue are clearly and accurately presented to the jury.  *Id.*

We begin our consideration of Appellant's claims of PCRA court error by highlighting that, in his PCRA petition, Appellant presented several other claims regarding the penalty phase jury instruction that he has abandoned on appeal.  He presented nine claims in total.  The PCRA court rejected each claim of error.  PCRA Court Memorandum, 1/8/2013, at 30-38.  Because the PCRA court found no error in the trial court's penalty-phase jury instruction, it could not, as Appellant suggests, consider "the cumulative impact of the errors."  Appellant's Brief at 92-93.  Moreover, as our summary of the PCRA court's reasoning demonstrates, the court did not simply reject Appellant's present claims by repeatedly determining that the trial court's instructions reflected the Sentencing Code or the Pennsylvania Suggested Standard Criminal Jury

---

[30] In response to Appellant's contentions, the Commonwealth offers an argument which essentially mirrors the reasoning of the PCRA court, albeit in an abbreviated manner. Commonwealth's Brief at 47-49.

Instructions. While the court did mention such things at times and in passing,[31] it certainly did not dispose of Appellant's claims in the manner described by Appellant.

We next observe that this Court has previously rejected Appellant's claim that, pursuant to *Ring*, a trial court must instruct a jury that, to sentence a defendant to death, they must determine that the aggravators outweigh the mitigators beyond a reasonable doubt. *E.g.*, *Commonwealth v. Roney*, 866 A.2d 351, 358-61 (Pa. 2005); *Commonwealth v. Sanchez*, 82 A.3d 943, 985 (Pa. 2013). Appellant does not acknowledge such decisions, let alone advocate that the Court should revisit them.

Lastly, regarding the alleged "future dangerousness" instruction, we highlight that, at trial counsel's request, the trial court instructed the jury as follows: "Now, Ernest Wholaver's age is a factor that may be considered in terms of whether or not he poses a future danger to society in any respect." Trial Transcript at 1237. While this instruction certainly is curious as it does not seem to relate to any relevant factor that the jury was required to consider, we can discern no error in the PCRA court's conclusion that the trial court did not instruct the jury to consider Appellant's "future dangerousness" as an aggravating circumstance. More specifically, this isolated portion of the charge does not expressly direct that "future dangerousness" is an aggravating circumstance to be considered for purposes of Appellant's sentence. Moreover, when we consider the entire jury charge, as we must, we observe that the trial court explicitly instructed the jury as to the only aggravating circumstances at issue in the case. Trial Transcript at 1235-36. The court made no mention of "future dangerousness" as being an aggravating circumstance at that point or at any other juncture in its instruction.

---

[31] *See, e.g.*, PCRA Court Memorandum, 1/8/2013, at 33 (noting that the trial court instructed the jury on the aggravating circumstances as they are written in the Sentencing Code).

Because the entirety of the court's instruction made clear that "future dangerousness" was not an aggravating circumstance to be considered by the jury, Appellant's claim that counsel was ineffective lacks arguable merit. For all of these reasons, Appellant has failed in his effort to demonstrate that the PCRA court erred by rejecting his claims of ineffective assistance of counsel related to the penalty-phase jury instruction.

**Issue XIII:** "Did the PCRA court err in denying Appellant's claim that he was denied due process of law when the Commonwealth misrepresented commutation statistics and led defense counsel to withdraw his request for a 'life means life' instruction, that trial counsel was ineffective for failing to verify the prosecutor's inaccurate statistical proffer, and that appellate counsel was ineffective for failing to raise this claim?"
Appellant's Brief at 6.

Regarding the penalty-phase jury instruction, Appellant's counsel requested that the trial court provide to the jury a "life means life" instruction pursuant to *Simmons v. South Carolina*, 512 U.S. 154 (1994). *See, e.g.*, *Commonwealth v. Carson*, 913 A.2d 220, 273 (Pa. 2006) (explaining that this Court "has held that a *Simmons* instruction is mandated only if two events occur: (1) the prosecutor must place the defendant's future dangerousness in issue; and (2) the defendant must have requested that the trial court issue the instruction"). In connection to this requested instruction, the parties initially appeared to agree that the trial court should apprise the jury that, in recent years, no life sentences had been commuted in Pennsylvania. Trial Transcript at 1216. However, after the court took a recess, the prosecutor informed the court that he had just called the Office of General Counsel and learned that Governor Schweiker commuted Ricky Pinkins' life sentence to a term of years in January of 2003. *Id.* at 1217. Armed with this information, trial counsel decided to withdraw his request for a *Simmons* instruction. *Id.* at 1218-19.

In his PCRA petition, Appellant accused the prosecutor of falsely representing the commutation statistic. PCRA Petition, 1/12/2012, at 165-70. Appellant maintained that the prosecutor failed to indicate that Pinkins' life sentence stemmed from his conviction for second-degree murder. *Id.* at 168. Appellant posited that Pinkins' commutation was irrelevant to the issue before the trial court, which, according to Appellant, was whether anyone convicted of first-degree murder and sentenced to life in prison had received a commutation of his life sentence to a term of years. *Id.* at 168-69. Appellant contended that the prosecutor's false representation of the commutation statistic amounted to prosecutorial misconduct. Appellant also claimed that, to the extent that trial counsel unreasonably relied upon this alleged misrepresentation in withdrawing his request for a *Simmons* instruction, counsel rendered ineffective assistance. *Id.* at 170-71.

The PCRA court denied these claims without holding an evidentiary hearing. In so doing, the court noted that it was unpersuaded that the prosecutor intended to prejudice Appellant by failing to note that the commuted sentence related to a conviction other than first-degree murder. PCRA Court Memorandum, 1/8/2013, at 38. The court explained that the ultimate question at issue during the relevant discussion among the parties and the trial court was whether any life sentences had been commuted in Pennsylvania in recent years, not whether anyone convicted of first-degree murder and sentenced to life imprisonment had received a commuted sentence. *Id.* at 38-39. In this regard, the court highlighted that, when discussing the statistic of commuted life sentences, the prosecutor and trial counsel referred only to the statistic of life sentences that had been commuted in Pennsylvania and that the prosecutor accurately represented that statistic. *Id.* at 39.

In his brief to this Court, Appellant renews his claims of prosecutorial misconduct and ineffective assistance of counsel. Appellant's Brief at 94-98. With regard to the PCRA court's rationale for rejecting his claims, Appellant offers only a cursory argument. *Id.* at 98. Appellant asserts that the PCRA court mistakenly found that this incident did not involve prosecutorial misconduct. *Id.* As to his claim of ineffective assistance of counsel, Appellant contends that the court erred "by holding that, although the prosecutor's statement misled counsel into withdrawing a critical jury instruction, counsel did not have a constitutional obligation to ensure that such a mistake did not occur." *Id.* The Commonwealth responds by arguing that the prosecutor did not falsely represent the commutation statistic; rather, he accurately informed the court that a life sentence, in fact, had been commuted recently in Pennsylvania. Commonwealth's Brief at 49-50.

As noted above, for purposes of the PCRA, "an issue is waived if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state postconviction proceeding." 42 Pa.C.S. § 9544(b). Here, the prosecutor's alleged misconduct took place during trial and could have been, but was not, raised at trial. Consequently, the issue is waived, leaving only Appellant's claim of ineffective assistance of counsel.[32]

At the heart of that claim is Appellant's position that he was entitled to a *Simmons* instruction and that trial counsel was ineffective for withdrawing his request for

---

[32] We nonetheless observe that the PCRA court's conclusion, as discussed *supra*, is supported by the record. During the relevant conversation among the parties and the trial court, the discussion focused on whether any life sentences had been commuted recently in Pennsylvania, not on whether any life sentences that were the result of first-degree murder convictions had been commuted. Trial Transcript at 1216-18. Thus, there is no factual predicate to support Appellant's contention that the prosecutor falsely represented the commutation statistic to the trial court.

such an instruction. Indeed, as to the prejudice prong of his claim of ineffective assistance of counsel, Appellant simply asserts, "Had the court given the [*Simmons*] instruction to which Appellant was entitled and which the court was willing to give, there is a reasonable likelihood of a different sentencing result." Appellant's Brief at 98. Regardless of any initial expression by the trial court concerning its willingness to provide the jury with a *Simmons* instruction, Appellant fails to appreciate that, to be entitled to such an instruction, the Commonwealth had to make Appellant's "future dangerousness" an issue. *Carson*, *supra*. Yet, neither in his PCRA petition nor in his brief to this Court does Appellant even suggest, let alone specifically contend, that the Commonwealth argued Appellant's "future dangerousness." Indeed, if Appellant's "future dangerousness" was at issue at all, it was Appellant who injected the issue into trial.[33] Thus, Appellant has failed to establish that he was entitled to a *Simmons* instruction and, concomitantly, that trial counsel was ineffective for withdrawing the request for a *Simmons* instruction, irrespective of his reasons for withdrawing the request.

> **Issue XIV:** "Did the PCRA court err in denying Appellant's claim that he was denied due process of law and a fair capital sentencing hearing as a result of the trial court's

---

[33] To illustrate, in his PCRA petition and his brief to this Court, Appellant asserts that his "future dangerousness" was placed at issue by the penalty phase jury instruction, discussed *supra*, which stated, "Now, Ernest Wholaver's age is a factor that may be considered in terms of whether or not he poses a future danger to society in any respect." Trial Transcript at 1237. We reiterate that the trial court gave this instruction at Appellant's request and over the Commonwealth's objection that the charge was available only to elderly and young defendants for purposes of mitigation. *Id.* at 1176. Thus, to the extent that this instruction arguably put Appellant's "future dangerousness" at issue, Appellant injected the issue, not the Commonwealth. Further, and perhaps more importantly, Appellant's undeveloped prejudice argument fails to demonstrate that, but for counsel's request for this instruction and his decision to withdraw the *Simmons* instruction, there is a reasonable probability that the outcome of his penalty phase hearing would have been different.

erroneous admission of prejudicial non-statutory aggravation and the prosecutor's improper argument during closing, and that prior counsel were ineffective for failing to preserve and litigate these issues?" Appellant's Brief at 6.

In his PCRA petition, Appellant presented two separate and unrelated issues that, for unknown reasons, he has combined in his brief to this Court. Because these issues are unconnected, we will dispose of them separately.

## 1. Prosecutorial Misconduct During Penalty-Phase Closing Argument

In his PCRA petition, Appellant claimed that the prosecutor committed misconduct by making numerous improper statements, which we discuss in more detail *infra*, during his penalty-phase closing argument and that trial counsel was ineffective for failing to object to the statements. PCRA Petition, 1/12/2012, at 180-202. The PCRA court dismissed these claims without holding an evidentiary hearing, essentially determining that the complained-of comments either were reflective of the evidence of record or were consistent with the law. PCRA Court Memorandum, 1/8/2013, at 42-49.

In his brief to this Court, Appellant reiterates his complaint that the prosecutor committed misconduct during his penalty-phase argument by: (1) urging the jury to consider non-aggravating factors; (2) telling the jury to give the aggravator found at 42 Pa.C.S. § 9711(d)(11) extra weight;[34] (3) stating that the grave-risk-of-death-to-another-person aggravator applied to all three murder victims; (4) improperly shifting the burden of proof onto the defense; (5) repeatedly and erroneously claiming that the defense had not presented any mitigating evidence; and (6) asserting that the jury should consider victim-impact evidence as a super-aggravator. Appellant's Brief at 102-08. Appellant

---

[34] This aggravating circumstance required the jury to determine whether Appellant had been convicted of another murder committed in any jurisdiction, either before or at the time of the offense at issue. 42 Pa.C.S. § 9711(d)(11).

further asserts that trial counsel's performance was deficient because he failed to object to these allegedly improper arguments. *Id.* at 108.

The Commonwealth takes the position that Appellant has waived several of his claims of prosecutorial misconduct by failing to offer a developed argument in support thereof. Commonwealth's Brief at 49-54. As to the remaining claims, the Commonwealth contends that Appellant previously litigated his claims that the prosecutor improperly urged the jury to consider non-aggravating factors and inaccurately suggested that Appellant did not present mitigating evidence. The Commonwealth also maintains that the prosecutor's argument regarding the grave-risk-of-death-to-another-person aggravator was supported by the record and that the prosecutor did not instruct the jury to consider victim-impact evidence as a super-aggravator. *Id.*

It is well settled that a "prosecutor has great discretion during closing argument; indeed, closing 'argument' is just that: argument." *Commonwealth v. Eichinger*, 108 A.3d 821, 836 (Pa. 2014) (citation omitted). "During closing argument in the penalty phase, a prosecutor must be afforded reasonable latitude, and permitted to employ oratorical flair when arguing in favor of the death penalty." *Commonwealth v. Spotz*, 47 A.3d 63, 97-98 (Pa. 2012) (citations omitted). "A prosecutor may make fair comment on the admitted evidence and may provide fair rebuttal to defense arguments. Even an otherwise improper comment may be appropriate if it is in fair response to defense counsel's remarks." *Id.* at 97 (citations omitted).

"Any challenge to a prosecutor's comment must be evaluated in the context in which the comment was made." *Id.* (citations omitted). "It is not improper for the prosecutor to urge the jury to view the defense's mitigation evidence with disfavor and thus to impose the death penalty." *Id.* at 98 (citations omitted). "Reversible error occurs

only when the unavoidable effect of the challenged comments would prejudice the jurors and form in their minds a fixed bias and hostility toward the defendant such that the jurors could not weigh the evidence and render a true verdict." *Id.* (citations omitted). For the reasons that follow, we conclude that the PCRA court did not err by rejecting Appellant's various claims.

Appellant first highlights that, during the prosecutor's penalty-phase closing argument, he stated that Appellant's solicitation-of-murder conviction, which was entered against Appellant contemporaneously with his murder convictions, "trumped" Appellant's proffered no-significant-history-of-prior-criminal-convictions mitigator. Appellant's Brief at 103 (citing Trial Transcript at 1224). Appellant maintains that there "is no theory of admissibility that would have allowed for the argument that Appellant deserves to die because he solicited murder *after* his capital offense." *Id.* (emphasis in original). Thus, according to Appellant, by making this statement, the prosecutor was "[u]rging the jury to consider non-statutory aggravating factors." *Id.*

Appellant is incorrect regarding the law, as a conviction that is entered at the same time as a first-degree-murder conviction can be used to rebut the no-significant-history-of-prior-criminal-convictions mitigator. *See Commonwealth v. Mitchell*, 902 A.2d 430, 461 (Pa. 2006) (explaining that, in *Commonwealth v. Wharton*, 665 A.2d 458 (Pa. 1995), this Court held "that the determining factor in whether convictions could be considered **prior** criminal convictions under Section 9711(e)(1) was whether the defendant had a particular conviction **at the time of the sentencing hearing**") (emphasis in original). Thus, contrary to Appellant's assertion, in making the complained-of statement, the prosecutor was not urging the jury to consider non-statutory aggravating factors; instead, consistent with *Wharton*, he was utilizing Appellant's solicitation conviction as rebuttal to the mitigating circumstance that

Appellant did not have a significant history of prior criminal convictions. Trial Transcript at 1224-25.

Next, Appellant challenges as misconduct the prosecutor's statement made during closing argument that, because Appellant killed three persons, his conduct is "three times as terrible." Appellant's Brief at 104 (citing Trial Transcript at 1226). Appellant posits that this statement violated the statutory scheme by: (1) directing the jury to conduct a quantitative evaluation of the mitigating and aggravating factors, as opposed to a qualitative evaluation; and (2) directing the jury to give extra weight to the (d)(11) aggravator, which provides that the defendant has been convicted of another murder committed in any jurisdiction, either before or after the time of the offense at issue.

Appellant's claim is unsupported by the record as the prosecutor did not in any way direct the jury to compare the number of aggravating circumstances against the number of mitigating circumstances found. Moreover, when read in the context of the closing argument as a whole, the prosecutor did not commit misconduct by emphasizing to the jury that Appellant's murder of three persons outweighed the mitigating circumstances presented.

Appellant next makes several contentions regarding a portion of the prosecutor's closing argument wherein he addressed the grave-risk-of-death-to-another-person aggravator. Appellant's Brief at 104-06. The prosecutor stated as follows:

> First, I submit that the evidence shows that the Defendant fired into the head of Victoria Wholaver at close range while she held her child in her arms. That is knowingly creating a risk of death to Baby Girl Madison, but he left this nine-month old child alone in this house with all of her caregivers dead, making no effort to summon help for her. It was mere happenstance 28 hours later she was found by police and paramedics. It could have been much longer. And he just disregarded that, knowing that risk to Baby Girl Madison, so that aggravating circumstance has been proven beyond a reasonable doubt.

Trial Transcript at 1222.

Appellant first suggests that this argument improperly offered to the jury contradictory considerations regarding Madison - one that presumes that she can crawl, and one that presumes that she cannot crawl. Appellant's Brief at 104-05. However, the complained-of comments simply did not require the jury to presume anything about Madison's ability to crawl. The evidence of record established that Victoria had been shot in the head at close range, Trial Transcript at 92-95, and that Madison was discovered between Victoria's arm and body, Trial Transcript at 69. Thus, the record permitted the prosecutor to comment fairly that Appellant knowingly created a grave risk of death to Madison by shooting her mother as she held the nine-month-old baby. It was equally fair comment for the prosecutor to suggest that Appellant created a grave risk of death to Madison by killing all of her caregivers and leaving the baby to fend for herself.

Appellant further suggests that the prosecutor improperly argued that the grave-risk-of-death-to-another-person aggravator applied to all three victims because the Commonwealth failed to present "sufficient evidence to meet the (d)(7) element of 'in close proximity at the time of the killing' beyond a reasonable doubt." Appellant's Brief at 105. Appellant, however, fails to acknowledge that, in his initial direct appeal, this Court specifically concluded that the Commonwealth's evidence was sufficient to support all of the aggravating circumstances found by the jury. *Wholaver*, 903 A.2d at 1183. Appellant's failure in this regard renders further consideration of the merits of this claim unnecessary.

Appellant subsequently offers a cursory argument that "the prosecutor improperly shifted the burden of proof to the defense, saying that the case 'call[ed] out for the death penalty' and '[i]f this man doesn't deserve it, nobody does.'" Appellant's Brief at 106

(citing Trial Transcript at 1228).  Appellant's woefully undeveloped argument fails to convince us that these comments improperly sought to shift any burden onto Appellant during the penalty phase.

In equally unconvincing arguments, Appellant complains that, throughout the prosecutor's penalty-phase closing argument, the prosecutor "repeatedly and erroneously claimed" that Appellant had not presented any mitigation evidence, Appellant's Brief at 106-07, and that the jury should consider victim-impact evidence "as a super-aggravator that 'trumped' all the mitigation in the case," *id.* at 107-08.  Our review of the record reveals that the prosecutor did not claim that Appellant failed to present any mitigation evidence; rather, consistent with the law cited above, he simply made fair comment on the admitted evidence, properly sought to rebut Appellant's arguments, and urged the jury to view Appellant's mitigation evidence with disfavor. Trial Transcript at 1224-26.  Moreover, the prosecutor did not instruct the jury to consider victim-impact evidence as a "super-aggravator."  Instead, the prosecutor properly informed the jury that they could consider the victim-impact evidence when weighing the aggravating and mitigating circumstances.  Trial Transcript at 1227; *see* 42 Pa.C.S. § 9711(c)(2) (explaining that a court must instruct the jury that, in weighing the aggravating and mitigating circumstances, they shall consider victim-impact evidence).

Appellant has failed to establish that any of his claims of prosecutorial misconduct have arguable merit.  Thus, his claim that counsel rendered ineffective assistance by failing to object to the alleged misconduct necessarily fails.

## 2.  Incorporation of Guilt-Phase Evidence into the Penalty Phase

In his PCRA petition, Appellant argued that he is entitled to a new sentencing hearing because the trial court erroneously granted the Commonwealth's motion to incorporate the guilt-phase evidence into the penalty phase.  *Id.* at 216-17.  Related to

this claim of trial court error, Appellant acknowledged that trial counsel objected to the wholesale incorporation of the guilt-phase evidence into the penalty phase, but he nonetheless maintained that counsel rendered ineffective assistance by failing "to request a cautionary instruction regarding the scope of how the jury was to consider the incorporated evidence and testimony." *Id.* at 218. Appellant also contended that appellate counsel was ineffective for failing to litigate this issue adequately. *Id.* at 218-19.

The PCRA court rejected these claims without holding an evidentiary hearing. The court concluded that: the underlying claim was previously litigated on direct appeal; the trial court properly exercised its discretion by granting the Commonwealth's request to incorporate the evidence into the guilt phase; and the trial court specifically instructed the jury as to what they could consider as aggravating and mitigating circumstances. PCRA Court Memorandum, 1/8/2013, at 53-54.

In his brief to this Court, Appellant again claims that the trial court erred by granting the Commonwealth's request to incorporate the guilt-phase evidence into the penalty phase. *Id.* at 100-02. Appellant, however, abandons his claim that trial counsel was ineffective for failing to request a cautionary instruction; instead, he contends, for the first time, that trial counsel's "failure to specifically identify the guilt phase evidence he objected to incorporating . . . constituted deficient performance." *Id.* at 108. Lastly, Appellant takes the position that appellate counsel was ineffective for failing to argue on direct appeal that the trial court erred by overruling trial counsel's objection to the incorporation of the guilt-phase evidence into the penalty phase. *Id.* at 109.

For its part, the Commonwealth initially contends that Appellant previously litigated his claim. Commonwealth's Brief at 51. It, however, also highlights that this Court has held that, after a defendant has been found guilty, "incorporation of guilt

phase evidence into the penalty phase is 'purely a procedural matter carried out pursuant to 42 Pa.C.S. § 9711.'" *Id.* (quoting *Commonwealth v. Williams*, 896 A.2d 523, 544-45 (Pa. 2006)).

To the extent that Appellant is claiming that the trial court erred by overruling trial counsel's objection to the guilt-phase evidence being incorporated into the penalty phase, his claim is waived for purposes of the PCRA because he could have raised the issue on direct appeal. 42 Pa.C.S. § 9544(b). Moreover, Appellant has waived his claim that trial counsel was ineffective for failing to identify specifically the guilt-phase evidence he objected to incorporating into the penalty phase, as he raises this issue for the first time on appeal. Pa.R.A.P. 302(a). Lastly, regarding appellate counsel's stewardship, Appellant fails to acknowledge that this Court has repeatedly stated that "once appellant's guilt was determined, incorporation of guilt phase evidence into the penalty phase was 'purely a procedural matter carried out pursuant to 42 Pa.C.S. § 9711.'" *Wholaver*, 989 A.2d at 907 (quoting *Williams*, 896 A.2d at 544-45).[35] Accordingly, Appellant has failed to show that appellate counsel was ineffective for failing to argue on direct appeal that the trial court erred by incorporating the guilty-phase evidence into the penalty phase.

**Issue XV:** "Did the PCRA court err in denying Appellant's claim that, because of juror misconduct, he was denied his right to a fair trial and an impartial jury, and that trial counsel was ineffective in not discovering and litigating the misconduct?" Appellant's Brief at 6-7.

---

[35] While this Court did cite this proposition of law in Appellant's direct appeal, it does not appear that appellate counsel raised the specific issue that Appellant pursued in his PCRA petition. *See Wholaver*, 989 A.2d at 907 (rejecting Appellant's contention that "the trial court erred in allowing incorporation of evidence from the guilt phase, concerning nine-month-old Madison Wholaver's dehydrated condition, into the penalty phase").

In his supplemental and amended PCRA petition, Appellant contended that trial counsel was ineffective for failing to discover juror misconduct. Supplemental and Amended PCRA Petition, 4/27/2012, at 31-34. After further discovery, Appellant ultimately claimed that a particular member of his jury committed misconduct by inaccurately answering her juror questionnaire where, according to Appellant, she misrepresented that neither she, members of her family, nor close friends had ever been a victim of a crime. Appellant maintained that trial counsel was ineffective for failing to discover this misconduct.

The PCRA court granted Appellant an evidentiary hearing to explore the merits of his claim. At that September 4, 2014, hearing, the juror testified that she answered her questionnaire honestly and truthfully. N.T., 9/4/2014 at 102-03. When asked whether anyone in her family was a sexual abuser, the juror stated, "Not that I'm aware of." *Id.* at 94. PCRA counsel specifically asked the juror if she had a brother-in-law who molested children prior to her selection to Appellant's jury. *Id.* at 97. She answered the question in the negative. *Id.*

We further observe that Appellant wished to have a second juror, Gregory Stein, testify at the PCRA hearing in support of his juror misconduct claim. The PCRA court did not permit Stein to testify because, *inter alia*, his proffered testimony delved into information regarding the jury's deliberations. N.T., 9/4/2014, at 4-13; *see* Pa.R.E. 606(b)(1) (prohibiting a juror from testifying about any statement or incident that occurred during the jury's deliberations). The court nonetheless allowed PCRA counsel to read Stein's affidavit, where Stein attested, in pertinent part, that, "during deliberations on the guilt/innocence portion of the case, one of the female jurors disclosed that someone close to her had been the victim of inappropriate sexual behavior." N.T., 9/4/2014, at 8.

The PCRA court credited the juror's testimony and, therefore, determined that Appellant failed to produce any credible evidence of juror misconduct. PCRA Court Memorandum, 3/31/2014, at 21-22. Accordingly, the court rejected Appellant's claim of ineffective assistance of counsel. *Id.*

In his brief to this Court, Appellant insists that the juror who testified at the PCRA hearing did not answer her juror questionnaire honestly or accurately, notwithstanding her testimony. Appellant's Brief at 111. According to Appellant, during deliberations, this juror revealed to her fellow jurors "her prior experience with and exposure to sexual abusers and their victims[.]" *Id.* In support of his position, Appellant relies on, *inter alia*, Stein's affidavit. Then, without adequately developing his claim of ineffective assistance of counsel, Appellant baldly asserts that the PCRA court denied him a full and fair hearing by refusing to allow Stein to testify at the PCRA hearing, which, Appellant contends, renders the court's merits ruling erroneous. *Id.* at 113. The Commonwealth, on the other hand, submits that Appellant failed to present any evidence to support his allegations of juror misconduct. Commonwealth's Brief at 54-55.

This issue warrants no relief. The PCRA court's conclusion that Appellant failed to prove that any juror misconduct occurred in this case turned on its favorable credibility determination regarding the juror's testimony at the evidentiary hearing. Because that credibility determination is supported by the record, we are bound by it. *Mason, supra.* Accordingly, Appellant's claim of ineffective assistance of counsel lacks arguable merit.[36] Moreover, to the extent that Appellant argues that the PCRA court erred by refusing to allow Stein to testify at the evidentiary hearing, his argument is

---

[36] In addition, Appellant has failed to meet his burden of specifically addressing each prong of the ineffective-assistance-of-counsel standard in his brief to this Court. *See Natividad*, 938 A.2d at 322 (explaining that "appellants continue to bear the burden of pleading and proving each of the *Pierce* elements on appeal to this Court").

fatally undeveloped and, therefore, waived. *See, e.g., D'Amato*, 856 A.2d at 814 ("This argument is so undeveloped that it is the functional equivalent of no argument at all. Therefore, the issue must be deemed waived in this Court.").

**Issue XVI:** **"**Did the PCRA court err in denying Appellant's claim that he should be granted relief from his convictions because of the cumulative effect of the errors described in this appeal?" Appellant's Brief at 7.

Under his last issue, Appellant contends that he should be granted relief based upon the cumulative effect of the alleged errors he details in this appeal. Appellant's Brief at 113-14. The Commonwealth takes the position that no such relief is due, as all of Appellant's innumerable prolix claims of error are meritless. Commonwealth's Brief at 55-56.

This Court has explained that no number of claims which fail on their merits may collectively warrant relief. *Commonwealth v. Spotz*, 18 A.3d 244, 320–21 (Pa. 2011). However, "[w]hen the failure of individual claims is grounded in lack of prejudice, then the cumulative prejudice from those individual claims may properly be assessed." *Id.* at 321.

None of Appellant's issues entitle him to relief. We have disposed of Appellant's issues in a number of ways, including lack of merit and Appellant's failure to carry his burden of persuasion on appeal. To the extent that we reject some of Appellant's issues based upon a prejudice analysis, we also find that collective prejudice is lacking and, thus, deny relief on this issue.

### IV. Appellant's Open Applications

We also must dispose of two open applications filed by Appellant. In both applications, Appellant seeks leave to file a post-submission communication with the Court pursuant to Pa.R.A.P. 2501(a). In his initial application, which was filed on May 5,

2017, Appellant seeks leave to file a motion for remand to the PCRA court for an evidentiary hearing regarding allegedly newly discovered evidence, as he claims he recently has learned that the Commonwealth has engaged in misconduct. Appellant has attached that motion for remand to his application. While we grant the May 5th application for leave to file the post-submission communication, for the reasons that follow, we deny the motion for remand.

In his motion for remand, Appellant contends that his counsel just learned that the national television network Investigation Discovery broadcasted a program documenting the Wholaver murders and that, in the program, several government officials, including the prosecutor in Appellant's case, discuss their investigation of a suspect named Stephen Chapman. Appellant contends that the Commonwealth violated *Brady* by suppressing their investigation of Chapman, and he requests a remand to explore the issue. The Commonwealth maintains that this program originally aired in May of 2013 and that the Commonwealth did inform Appellant of the investigation of the suspect; however, the program producer assigned a pseudonym to the suspect to protect his identity.

Appellant is attempting to amend his PCRA petition to include a claim of after-discovered evidence. Appellant fails to cite any authority that would allow him to amend the petition decided herein at this late stage of litigation. Accordingly, we deny Appellant's motion for remand without prejudice to Appellant to attempt to raise his after-discovered-evidence claim in a serial PCRA petition.

In his second application for leave to file a post-submission communication, which was filed on June 8, 2017, Appellant asks for permission to file a motion requesting that the parties be ordered to submit briefs on the impact of the United States Supreme Court's recent decision in *McWilliams v. Dunn*, 137 S.Ct. 1790 (2017).

Appellant believes that this decision may assist the Court in resolving his second issue, as detailed on pages 10-14, *supra*, because *McWilliams* involves the application of *Ake*. After independently reviewing *McWilliams* and given the manner in which we disposed of Appellant's second issue,[37] we conclude that further briefing on *McWilliams* is unnecessary. Accordingly, we deny Appellant's June 8th application for leave to file a post-submission communication.

### V. Conclusion

For the reasons set forth above, we affirm the order dismissing Appellant's PCRA petition.[38]

Chief Justice Saylor and Justices Todd, Donohue, Dougherty, Wecht and Mundy join the opinion.

---

[37] Appellant asserted that trial and appellate counsel improperly challenged the trial court's rulings regarding his requests for experts and funding simply by relying on *Ake*. We determined that this assertion was belied by the record. *Supra* at 13-14.

[38] The Prothonotary of the Supreme Court is directed to transmit the complete record of this case to the Governor pursuant to 42 Pa.C.S. § 9711(i).